Doane v. Millville Ins. Co.

SAMUEL H. DOANE et al., appellants,

v.

THE MILLVILLE MUTUAL MARINE AND FIRE INSURANCE COMPANY, respondent.

1. Under the contracts for insurance made between The Millville Mutual Marine and Fire Insurance Company and those who became members of it by entering into such contracts, the by-law of the company, according to which deposit notes, given for marine insurance, were assessable only in proportion to the losses by sea, and deposit notes, given for fire insurance, were assessable only in proportion to the losses by fire, was expressly included as a term of the contract, and is binding upon the corporation.

2. Under the like contracts the by-law of the company, according to which losses by sea were to be paid only out of the funds derived from marine insurance, and losses by fire were to be paid only out of the funds derived from fire insurance, was excluded by the terms of the contracts, and is not binding upon the insured persons sustaining loss.

3. According to a by-law, made part of such contracts, the secretary, upon cancellation of a policy, was to retain the premium note until a proportionate part of all prior assessments and losses was paid. The directors of the company having voted to cease writing policies, and that two and one-half per cent. on their premium notes would pay all existing fire obligations, and that the secretary should require a payment of that percentage on policies offered for cancellation, the secretary surrendered certain premium notes on receipt of two and one-half per cent. thereof and the canceled policies.—*Held*, that the makers of those notes remained liable to a proportionate part of prior losses which exceeded the assessments of two and one-half per cent.

4. Under section 80 of the Corporation act (*Rev. p. 174*), the judgment creditors of insolvent corporations are preferred, in the distribution of the funds, only so far as they have acquired liens.

On appeal from a decree advised by Vice-Chancellor Bird, whose opinion is reported in *Doane* v. *Millville Insurance Co.*, *16 Stew. Eq. 522.*

Several appeals were taken from various portions of the decree, relating to the distribution of the assets of the defendant company, which had been declared insolvent on bill filed by the complainant, a judgment creditor.

The appeals were argued together.

*Messrs. Leaming & Black,* for J. Holmes Hand and Richard S. Leaming, appellants.

*Mr. D. J. Pancoast,* for John J. Reeves et al., appellants.

*Messrs. Grey & Grey,* for John M. Moore and D. Wilson Moore, appellants.

*Mr. Jas. H. Nixon,* for several policy-holders, appellants.

*Mr. Wm. H. Potter,* for Howard S. Carll and Ebenezer M. Wright, respondents.

*Mr. Thos. E. French,* for the receiver, respondent.

The opinion of the court was delivered by

Dixon, J.

These appeals bring up for review parts of the decree made in pursuance of the opinion reported in *16 Stew. Eq. 522.*

The question to be first considered relates to the obligation resting upon the members of the corporation to contribute to the fund for the payment of its debts.

The charter (*P. L. of 1859 p. 144*) enacts that all persons who shall insure with the corporation shall thereby become members thereof, and, before receiving their policies, shall pay such sum of money and deposit their promissory note or notes for such sum of money as shall be determined upon by the directors; that the corporation shall have a lien on the property insured to the amount of the deposit note or notes given for the insurance; that the notes shall be paid at such times and in such manner as the by-laws may determine, and that the corporation may maintain suits at law or in equity for the collection of the notes or any part thereof. There are no other provisions looking toward individual liability, and although the corporation is styled a *mutual* insurance company, it is plain that the mutual responsibility of the members was designed to extend no further than their deposit notes should require.

On referring to these deposit notes we find that they promised the payment of designated sums of money " in such proportions and at such time or times as the directors of said company might, agreeably to their charter, require." As already stated, the charter directs that these notes be paid at such times and in such manner as the by-laws should determine. Hence, the by-laws become the test by which the responsibility of the members on their notes is to be ascertained. The by-laws have, since the organization of the company, divided these notes into two classes, those given for insurance against marine loss and those given for insurance against fire loss, and have provided that no assessment should be made upon notes of either class for losses incurred in the other class, but that notes in each class should be assessable for the losses in that class and for an equitable share of the expenses of the company.

It is therefore evident, that each member is to contribute such a proportion of his deposit note as will be necessary to make up the amount of the losses in that class of insurance to which his note belongs, and a just share of the expenses of the company, and that his responsibility then ends. This accords with the principle upon which the business of insurance is ordinarily conducted. The property to be insured is classified with reference to the risk of loss to which each species is subjected, and the premiums charged for insuring the property in each class are such as will, in the aggregate, meet the losses in that class, a fair share of all the expenses and a profit to the insurer. When, as in the present company, there is mutual insurance, a profit is not to be sought for, but if nevertheless realized, it must, according to the charter, be returned to the members.

There are reported cases in which it has been held that the amount of the deposit notes given to mutual insurance companies was absolutely recoverable by the companies without any formal assessment, and that, besides, each member was liable to an assessment for such sum as was necessary to pay losses upon the policies issued. These decisions turn upon peculiar provisions, either in the statutes or in the by-laws to which the deposit notes refer. *Long Pond Mutual Fire Ins. Co.* v. *Houghton,*

*6 Gray 77*, and *White* v. *Haight, 16 N. Y. 310*, are instances of this sort. They cannot, however, be taken as guides in the present controversy, where the grounds for adjudication are so dissimilar. The conclusion above stated is that to which the charter of this company and its contract with its members lead.

It appears that on July 28th, 1885, the directors of the company resolved to cease writing policies, on account of the unpromising outlook for future business, and decided that two and one-half per cent. on their premium notes would pay all existing fire obligations and necessary expenses, and therefore instructed the secretary to require a payment of two and one-half per cent. on all premium notes on policies offered for cancellation. In alleged pursuance of this resolution, the secretary surrendered many premium notes on receipt of two and one-half per cent. It now appears that two and one-half per cent. of the fire notes will not equal the fire losses and expenses, and the question was raised in the court below whether the surrendered notes are subject to further assessment. It having been decreed that they are, John M. Moore and D. Wilson Moore appeal therefrom. We think the decree is right.

The resolution above quoted did not direct the secretary to surrender the notes, but only to require a certain payment upon them as a preliminary to the cancellation of the policies. Section 14 of the by-laws then became applicable, which provides that :

"When a policy is surrendered to be canceled or renewed, the secretary shall endorse the date of such surrender thereon and on the premium note. But he shall not deliver the premium note until the expiration of twenty days thereafter, and until a proportionate part of all prior *assessments* and *losses* are paid."

The purport of this is, that while the surrender of the policy will terminate the membership of the holder and fix the period after which losses will not affect him, yet his premium note must be retained to secure a due proportion, not only of prior assessments, but also of prior losses. The payment of the due proportion of the prior *assessment* of two and one-half per cent. did

not warrant a surrender of the note; it should still have been held for the due proportion of prior *losses*.   Even if the directors intended that the notes should be given up on payment of the two and one-half per cent., yet, plainly, such an intention could have been honestly formed only upon a mistake of fact, a mistake as to the amount of losses or the amount of notes, or both, and the note-maker could have honestly taken up the note only on a like mistake, for both parties well understood that the sum due depended on the relation between these two amounts, and there is no reason why this mutual mistake should not be rectified.

The next question involves a consideration of the rights of those policy-holders who have sustained losses on the property insured.   When the corporate assets shall have been collected in the method above indicated, are all these policy-holders, whether they were insured against loss by sea or loss by fire, to divide the whole fund ratably, or are those who have suffered loss by fire to be confined to the fund raised from the notes given for fire insurance, and those who have suffered marine loss to be confined to the fund raised from notes given for marine insurance?   This question must be answered by the contract.

According to the corporate charter, the contract of insurance is to be made by the company itself with each person insured, and not mutually among the members of the company, and is to be ascertained by the policy which the company shall issue. This is explicitly declared by the sixth section of the charter, which enacts:  .

" That all policies or contracts founded thereon   *   *   *   shall be binding and obligatory upon said company, and the company shall be liable for all loss or damage sustained, agreeably to and on such terms and conditions as shall be contained in the policy."

Nothing in the charter refers to any other evidence than the policy, touching the indemnity which the assured is to obtain. Under this charter policies in various forms have been issued, but they all indicate that the corporation alone is the insurer, and that it is to be held generally and as an entirety, without

any suggestion that its liability under the policies is confined to any specific fund, and without reference to any other instrument than the charter itself as to the corporate obligation. Looking, therefore, to the charter and the policies only, it appears that all persons insured have an equal claim upon all the assets of the company for indemnity against loss, whether the loss occur by sea or by fire.

It is, however, contended, that, inasmuch as the by-laws have always provided that the revenues derived from marine insurance should be appropriated exclusively to the payment of marine losses, and those from fire insurance exclusively to the payment of fire losses (except that each class should bear a fair share of the expenses), therefore the rights of the policy-holders must be thus restricted. This contention is maintained on two grounds: first, that the policy-holders, being members of the corporation, are, *ipso facto*, bound by its by-laws; second, that having been informed of the existence of the by-law when they received their policies, they are estopped from denying to it the effect claimed.

The general proposition, that the members of a mutual insurance company are bound by its lawful by-laws, is not applicable to the case in hand. The facts, with which we have now to do, are these: That the company is empowered to make contracts of insurance, which, according to its charter, shall be binding upon it agreeably to the terms contained in the policy; that it tenders such a contract, set out in a policy, to an individual not a member, and asks his concurrence in the contract, stating to him (as the charter does) that if he accepts he will become a member of the company; and thereupon he does accept. If, under these circumstances, it were held that the company was bound as an insurer, not according to the policy, but only according to an inconsistent by-law, then it would be evident that the by-law had overridden the charter, for the charter directs that the company be bound agreeably to the policy. It would also be evident that the company might impose *ad libitum* on those seeking insurance from it, for however desirable the thing accepted had been, the thing received would be what the company had chosen to make it. But it may be said that the applicant for insurance

should not accept the policy until he has inspected the by-laws. This is tantamount to asserting his right to such inspection, and a corresponding duty on the part of the company to disclose them. Had such a disclosure been demanded and only partially made, no just mind could resist the conclusion that the company would be estopped from enforcing those by-laws not disclosed. The tender of the policy, under such a charter as the present, is, for all practical purposes, equivalent to a declaration that there are no by-laws inconsistent with its terms. Such was in effect the decision of this court in *Miller* v. *Hillsborough Mutual Fire Assurance Association, 17 Stew. Eq. 224.* The charter of that association, like the present one, made all persons insured members of the corporation. The policy there under consideration expressly stated that the insurance was made subject to the constitution, by-laws and conditions of the association ; yet, as the company had annexed to the policy only some of the by-laws, and had denominated them "conditions of insurance," it was deemed inequitable to permit the company to set up that the insurance was subject to any other by-laws than those so annexed, and it was decreed that the policy should be reformed so that its terms would not include any others. This decision recognizes the principle, that whether a by-law of a mutual insurance company is part of the contract between the company and a person becoming a member by accepting insurance, will depend, not on the fact that such a by-law exists, but on the correct interpretation of the terms of the policy.

But, in the next place, it is a feature of the case stated, "that it was the general practice and custom of the officers and agents of the company to inform applicants for mutual policies that the fire department and the marine department were kept separate and independent," and therefore it is insisted, that the losses in these several departments are payable only out of their respective funds.

If the exclusion from the contract of the by-law now in question depended solely on the estoppel against the company, then the practice thus stated would, for every case in which it was followed, prevent such exclusion. But I think it does not de-

pend on estoppel only. In matters of contract, an estoppel arises where some unfairness, some fault of omission or commission, is attributable to one of the parties. But there is no propriety in charging any fault upon the company because it tendered such policies as those now before us, or upon the persons insured because they seek to hold the company according to the terms of those policies. Whether the applicants for insurance knew of this by-law or not, they knew and the company knew that the company could waive any by-laws which it had made, and could contract according to the terms of its policies, and therefore both parties were entitled to assume that, whatever information either party had received, whatever resolutions either party had taken, the conventional obligations of the company were fixed by the policy. We have but to regard them, as the charter evidently intended they should be regarded, as contractors, and then apply to their contracts the usual rules, to be rid of the perplexities and dangers with which any other course is impeded. Having reduced their bargains to writing, they have excluded all evidence of their contract except the writing and the matters to which the writing refers. Thus are avoided the difficulties which would attend upon the effort to ascertain in what cases the custom of the company's agents was and in what cases it was not followed, and to distribute the funds accordingly.

It also appears that after the first five years of the company's existence, the actual management of the company in the payment of its losses indicated, what its policies declared, that this provision of the by-laws was in effect abrogated, for since that period the revenues of the marine department have been constantly used, to an amount now reaching $42,000, to pay losses in the fire department. This practice makes it reasonable to believe that the actual understanding of the parties corresponded with the legal import of their written contract, to the effect that, while the individual responsibility of the members on their deposit notes was measured by the losses in the respective departments, the responsibility of the company on its policies was general and unrestricted.

One other question remains : To what preference are judg-
ment creditors of the company entitled in the distribution of
the assets? The question arises out of section 80 of the Cor-
poration act (*Rev. p. 174*), which reads as follows :

"In payment of the creditors and distribution of the funds of any such [in-
solvent] company, the creditors shall be paid proportionally to the amount
of their respective debts, excepting mortgage and judgment creditors, when
the judgment has not been by confession for the purpose of preferring cred-
itors."

In considering this statute, it must be noted that no rule is
expressly laid down for the payment of mortgage and judgment
creditors; they are simply excepted from the rule prescribed for
creditors generally. What rule should be applied to them is
therefore left to implication. With regard to mortgage creditors,
the only defensible implication seems to be, that they are enti-
tled to preference merely to the extent of their liens; that so far
as their debts are left unsatisfied after their liens are exhausted,
they are but general creditors. No rational basis for any greater
preference than this can be found, either in the general princi-
ples of the law or in the legislation of this State. When in this
statute the words "mortgage creditors" were employed, there was
no misuse of terms, if the idea to be conveyed was limited to so
much of the debt as the pledge represented. But with regard
to judgment creditors, the case is somewhat different. The en-
tire debt is as truly a judgment debt as is any portion of it. At
the common law, and in certain circumstances under our stat-
utes, judgment debts as such are preferred, without reference to
any specific lien under them. These considerations might war-
rant the implication that, in the section now under review, they
are reserved from the class of general creditors in order that
this complete preference may be accorded to them. But, in the
opinion of the majority of this court, it is more consonant with
the terms of this section, which place mortgage and judgment
creditors so closely together, and more in accord with judicial
views now prevalent, to hold that judgment creditors likewise
shall be preferred only so far as they have acquired liens; that

if real estate has become subject to the judgment, or if personal property has been bound by delivery of an execution to the sheriff, or if the judgment creditor has elected to satisfy his execution by any debts due the corporation, under section 67 of the Corporation act, the rights thus created shall not be disturbed; but that, in the absence of any such claim, the mere fact that the debt has been put into judgment will not secure any preference to the creditor.

The decree appealed from should be reversed, and a decree entered in accordance with this opinion.

*Decree unanimously reversed.*