685 A.2d 1286

# IN THE MATTER OF THE LIQUIDATION OF INTEGRITY INSURANCE COMPANY.

Argued January 29, 1996—Reargued September 24, 1996—Decided December 12, 1996.

*Thomas S. Novak* argued the cause for appellant, Commissioner of Insurance of the State of New Jersey, in his capacity as Liquidator of Integrity Insurance Company (*Sills Cummis Zuckerman Radin Tischman Epstein & Gross,* Special Council, and *Peter G. Verniero,* Attorney General of New Jersey, attorneys; *Mr. Novak* and *Joseph L. Yannotti,* Assistant Attorney General,

of counsel; *Adam J. Kaiser* and *Thomas M. Hunt*, Deputy Attorneys General, on the brief).

*Barry G. Saretsky,* a member of the New York bar, argued the cause for respondent Credit Lyonnais (*Shanley & Fisher,* attorneys; *Susan M. Sharko,* on the briefs).

*James M. Mulvaney* submitted a brief on behalf of *amicus curiae,* Surety Reinsurers (*McElroy, Deutsch & Mulvaney,* attorneys; *Mr. Mulvaney* and *Margaret F. Catalano,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

Integrity Insurance Company (Integrity or surety), a New Jersey insurance company, became insolvent and filed for liquidation. The Commissioner of Insurance (Commissioner) was appointed the Liquidator. Integrity had previously issued surety bonds to Credit Lyonnais, guaranteeing the payment of the promissory notes of investors in certain partnerships. The promissory notes, which called for installment payments, were assigned to Credit Lyonnais as collateral for substantial loans that it made to the partnerships. Before Integrity was liquidated, the debtors had begun to default on their installment payments.

The relevant statute governing the liquidation of an insolvent insurer permits creditors to file claims that are due against the insurance company. Credit Lyonnais filed claims for the full amounts of the promissory notes even though not all of the unpaid installments on the notes were actually due and owing on the date the surety bonds terminated. That Credit Lyonnais may not file a claim with the Liquidator for post-termination losses is undisputed. Credit Lyonnais, however, claims that it faced an uninsurable risk at the time of Integrity's default and could not purchase alternative insurance with its returned premium. Therefore, it faced a loss in the full amount of the bond. The issue, then, is whether under basic principles of contract law Credit Lyonnais is entitled to file a claim for the full amount of the surety bond

because Integrity's liquidation, a breach of contract, led to damages equal to the whole value of the bond.

I

In 1984 and 1985, seven different groups of investors each created their own limited partnership in California. Some investors were limited partners in more than one partnership. Those partnerships were created as tax shelters for the investors.

The investors signed promissory notes obligating them to make installment payments to the limited partnerships running through November 1989. According to the terms of the promissory notes, if an investor defaulted on an installment payment, the limited partnership maintained the right to demand immediate payment of the entire note.

All seven partnerships obtained loans from Credit Lyonnais, a multinational bank. The partnerships assigned the promissory notes to Credit Lyonnais as collateral for the loans. As part of those assignments, Credit Lyonnais became entitled to receive the installment payments directly from the investors. Credit Lyonnais sought surety bonds from Integrity to cover the risk of default on the part of the investors and partnerships.

Integrity issued surety bonds to Credit Lyonnais that obligated Integrity to pay to Credit Lyonnais the entire amount of the note if the principal debtor defaulted. In sum, Integrity guaranteed repayment of Credit Lyonnais's loans to the partnerships. Integrity also issued surety bonds to other banks for similar arrangements with limited partnerships. To limit its risk, Integrity reinsured those bonds. At the time of insolvency, Integrity had reinsurance policies in the amount of $63.5 million.

In 1986, the investors began to default. Credit Lyonnais sent timely notice to Integrity, demanding payment of the missed installments; Integrity covered the missed payments pursuant to the surety bonds. The obligation to pay the entire unpaid balance on the notes was not accelerated. Integrity sought to collect the

unpaid amounts from the defaulting investors. In some cases, Integrity sued and obtained judgment for the entire amount of the bond, not simply the amount of the missed payment. Although Integrity obtained judgments for the entire amount, it apparently never actually collected more than the amount of missed installments.

In 1987, Integrity filed an action for insolvency and liquidation in the Superior Court, Chancery Division, under the statutory scheme governing regulated insurance companies, *N.J.S.A.* 17:30C–1 to –31. On March 24, 1987, the Chancery Division issued an Order of Liquidation declaring Integrity to be insolvent. The Commissioner was appointed to serve as Liquidator and was authorized to wind up the company's affairs. Although the reinsurance policies were to remain in effect, the court ordered Integrity's surety bonds to terminate on April 24, 1987. The reinsurers were required to pay the full amount of any claim to the Liquidator, even if the underlying claimants received only a percentage of their claims from Integrity's remaining assets. In addition, the order set a deadline for filing proofs of claim against Integrity.

On July 8, 1987, the court established the procedure for the determination of proofs of claim. The Liquidator was required to recommend whether the court should accept the proofs of claim by issuing Notices of Determination. Claimants that disagreed with the Liquidator's determination could demand a hearing.

Credit Lyonnais submitted seven proofs of claim under the surety bonds. Hundreds of proofs of claim were submitted against other surety bonds that had been issued by Integrity. The Liquidator recommended that the trial court deny all the proofs of claim to the extent they made claims for installments that were due after April 24, 1987, the date the surety bonds terminated. He relied on *N.J.S.A.* 17:30C–28a(1), which provides that proofs of claim can encompass all claims that "[became] absolute against the insurer on or before the last day fixed for filing proofs of claim."

The Liquidator then filed a motion for summary judgment, which Credit Lyonnais and other banks opposed. The trial court appointed a Special Master to hear the claims. The Special Master concluded that the surety bonds terminated under the Liquidation Order and recommended denying the claims for defaults on installments due after termination, because they neither occurred nor existed at the time the bonds terminated. The Special Master further recommended refunding unearned surety premiums attributable to post-termination coverage.

The trial court adopted the Special Master's recommendation, in November 1992, and granted summary judgment to the Liquidator, denying claims for post-termination defaults but ordering the return of unearned premiums. The trial court remanded to the Special Master, however, to create a formula for calculating unearned premiums. The Special Master's calculations were approved in an additional order in April 1994. Credit Lyonnais then appealed the portions of the trial court's order, granting the Liquidator's motion for summary judgment and confirming the disallowance of the proofs of claim to the extent they sought a distribution for post-termination defaults. The Liquidator cross-appealed on the limited basis that if the entire claim was upheld, the order returning the premiums should be reversed.

The Appellate Division reversed. 281 *N.J.Super.* 364, 657 *A.*2d 902 (1995). It held that Credit Lyonnais's claim was valid, because under the text of the bond Integrity's obligation to pay the outstanding bond amount arose when it issued the bond. In addition, the panel held that the Liquidator was judicially estopped from challenging this interpretation. The Appellate Division upheld Credit Lyonnais's claim for the full amount of the unpaid balance and vacated the award of unearned premiums. We granted Integrity's petition for certification. 142 *N.J.* 510, 665 *A.*2d 1104 (1995).

## II

The Legislature has enacted a statutory design to govern insolvent insurance companies, *N.J.S.A.* 17:30C-1 to -31. Under

*N.J.S.A.* 17:30C–8, the Commissioner can apply to the Superior Court for an order directing the liquidation of an insolvent insurance company. The court will grant an order of liquidation if the insurer is indeed insolvent, and the Commissioner will be appointed the liquidator.

██ The order of liquidation effectively ends the insurer's business, and the court is required to set a specific date for the termination of all policies. "When a company of this character becomes insolvent, and passes into the hands of a receiver, it ceases to be for all purposes, except that declared by the statute, the winding up of its affairs....". *Doane v. Milville Mut. Marine & Fire Ins. Co.,* 43 *N.J.Eq.* 522, 535, 11 *A.* 739 (Ch. 1887), *rev'd on other grounds,* 45 *N.J.Eq.* 274, 17 *A.* 625 (E. & A. 1889). After liquidation and termination, any losses suffered by policyholders "should be disallowed. The date of the decree of insolvency is the time at which the [insurer's] liability for future losses terminated." *Withers v. Great Am. Nat'l Life Guardian,* 124 *N.J.Eq.* 4, 9, 200 *A.* 485 (Ch.1938); *accord Mayer v. Attorney General,* 32 *N.J.Eq.* 815 (E. & A. 1880).

*N.J.S.A.* 17:30C–9 requires the Commissioner to marshall all assets of the estate, and *N.J.S.A.* 17:30C–20 provides a mechanism for those with claims against the insurer to submit them and collect from the marshalled assets. The statute, however, does not provide much guidance concerning which claims should be allowed in liquidation, nor does it define the amount of any claim that may be filed due to the premature termination of an insurance policy. Those answers must be found in the common law.

██ The common-law rule is that "[w]here an insurance company is adjudged insolvent, the claims existing on behalf of its policyholders have been held to be in the nature of damages for a breach of the contract." 19A John A. Appleman & Jean Appleman, *Insurance Law & Practice* § 10721, at 196 (1982).

██ On the date of liquidation, Integrity breached its contract with every policyholder, because it repudiated its prior promise to

provide insurance and bear future losses. As a result of that breach, each policyholder was entitled to pursue a claim for damages pursuant to ordinary contract rules. Contract damages are "designed 'to put the injured in as good a position as he would have had if performance had been rendered as promised.'" *Donovan v. Bachstadt,* 91 *N.J.* 434, 444, 453 *A.*2d 160 (1982) (citation omitted).

For most policyholders, damages should not be a simple return of premiums, but rather "the difference between the cost of a new policy and the present value of the premiums yet to be paid on the policy at the date of the breach." 19A Appleman, *supra,* § 10721, at 204; *see also American Lead Pencil Co. v. New Jersey Title Guarantee & Trust Co.,* 130 *N.J.Eq.* 148, 151, 21 *A.*2d 341 (Ch.1941) (awarding cost of replacement insurance), *aff'd o.b.,* 131 *N.J.Eq.* 473, 24 *A.*2d 849 (E. & A. 1942); *In re Citizens Title Ins. & Mortgage Co.,* 127 *N.J.Eq.* 551, 554, 15 *A.*2d 57 (Ch.1940) (awarding cost of replacement insurance upon liquidation). The cost of replacement insurance is evaluated as of the date of termination, and should include consideration of any increased risk of loss due to events since the issuance of the policy that have increased the cost of insurance. *See Davis v. Amra Grotto M.O.V. P.E.R., Inc.,* 169 *Tenn.* 564, 89 *S.W.*2d 754 (1936) (stating that cost of replacement life insurance, including fact that policyholder is now older and disabled, is proper award), *reh'g denied,* 170 *Tenn.* 19, 91 *S.W.*2d 294. Allowing a claim for the cost of reinsurance makes sense, because the damages suffered by a policyholder, on the date of breach, are limited to the cost of replacement insurance. "The insured is enabled to place himself in the same position he would [have] been in if his insurance policy had not been cancelled by receiving [funds] sufficient to obtain similar insurance. . . ." *Caminetti v. Manierre,* 23 *Cal.*2d 94, 142 *P.*2d 741, 747–48 (1943).

Many courts have followed this breach-of-contract approach to valuing claims, awarding the cost of replacement insurance. *See, e.g., Carr v. Hamilton,* 129 *U.S.* 252, 9 *S.Ct.* 295, 32 *L. Ed.* 669

(1889) (stating that, on insolvency, policyholders have claim for equitable value of policy); *Shloss v. Metropolitan Surety Co.*, 149 *Iowa* 382, 128 *N.W.* 384 (1910) (holding that policyholders become creditors in amount equal to equitable value of policies); *Kentucky Home Life Ins. Co. v. Miller*, 268 *Ky.* 271, 104 *S.W.*2d 997, 1000 (1937) ("[U]pon the insolvency of the [insurance company] the policyholder became entitled to his proportionate share in the reserve or cash value . . . of his policy . . . against the estate of the defunct company."); *New York v. Security Life Ins. & Annuity Co.*, 78 *N.Y.* 114 (1879) (awarding damages in amount of cost of replacement insurance); *Smith v. St. Louis Mut. Life Ins. Co.*, 2 *Tenn. Ch.* 727 (1877) (stating that upon insolvency each policyholder is entitled to recover difference between cost of new policy and present value of premiums yet to be paid on policy at time of breach through insolvency); *Universal Life Ins. Co. v. Binford*, 76 *Va.* 103 (1882) (holding policyholders entitled to amount required to purchase replacement insurance); *accord* 2A *Couch on Insurance 2d* § 22:70, at 673 (rev. ed. 1984) ("[T]he company is liable in damages measured by the net value of such policies, calculated as of the date of dissolution."); ·Annotation, *Basis for Allowance of Claims Under Policies of Insolvent Life Insurance Company*, 106 *A.L.R.* 1513 (1937). *But see State v. Surety Corp. of Am.*, 162 *A.* 852, 856 (Del.Ch.1932) (holding that damage award for default is return of unearned premium); *Guy v. Globe Ins. Co.*, 9 *Ins. L.J.* 466 (Va.1880) (recognizing that, ordinarily, claimant's damage award should be calculated as cost of replacement insurance, but holding that when claimant is uninsurable, claim is limited to return of premiums).

■ If the debtors in the current appeal had never indicated any sign of default, but then suffered financial setbacks after liquidation and subsequently defaulted, Credit Lyonnais's claim would be limited to the cost of replacement insurance on the date of termination; it would not be able to recover for the cost of replacement insurance based on post-termination losses. When a life-insurance policyholder died several days after insolvency, the

Pennsylvania Supreme Court awarded the net value of the policy, calculated on the date of insolvency, and refused to award a death claim. *Commonwealth ex rel. Kirkpatrick v. American Life Ins. Co.*, 162 *Pa.* 586, 29 *A.* 660 (1894); *see also Shloss, supra*, 128 *N.W.* at 384 ("[H]e cannot maintain a claim ... for the amount provided in̄ the policy to be paid in the event of loss on account of a loss suffered subsequently to the date of such final decree of dissolution."). That rule implements a basic principle of contract law: once the policy is terminated, Credit Lyonnais should secure reinsurance; if it does not, then it should bear the cost of that failure to mitigate. Integrity is not liable for damages suffered as the result of post-termination losses due to Credit Lyonnais's failure to mitigate.

If, however, the debtors' defaults before the date of termination indicated such a likelihood of future default that replacement insurance was unavailable, then the Court should award the full amount of the policy. "[T]he claim of a policyholder should be valued as a death claim [for the entire amount], where, from the age and health of the claimant, reinsurance would be impossible." 19A Appleman, *supra*, § 10721, at 204. Thus, the California Supreme Court has held that an uninsurable policyholder should receive the face amount of his or her policies "less the premiums payable during his [or her] life expectancy, each reduced to its value at the time of cancellation." *Caminetti, supra*, 142 *P.*2d at 747; *accord Commissioner of Ins. v. Massachusetts Accident Co.*, 314 *Mass.* 558, 50 *N.E.*2d 801, 807–08 (1943) (upholding award to policyholders of full value of disability insurance). The unavailability of insurance indicates that the insured event is no longer a risk but a certainty, and the insured should obtain compensation based on that reality.

At the time that Integrity was adjudged insolvent, the investors and limited partnerships had defaulted on several payments. Those investors, however, still were obliged to make additional installment payments that were not due until after Integrity's date of liquidation. Although those later payments were not yet due,

Integrity·has conceded below that, as a result of the investors' prior failure to pay, the risk of default on the remaining payments was so great that Credit Lyonnais could not have obtained alternative insurance. "The Liquidator now acknowledges that replacement insurance was unavailable once Integrity became insolvent." *In re Integrity Ins. Co.*, 281 *N.J.Super.* 364, 376, 657 *A.*2d 902 (App.Div.1995).

When Integrity terminated its policy with Credit Lyonnais, the investors had not yet defaulted on not-yet-due payments. As of that date, however, the risk of default was such a certainty that no other insurance company would provide insurance. On that date, the market had determined that Credit Lyonnais faced a loss in the total amount of its bond (which loss Integrity had promised to bear), and no one was willing to purchase that potential loss. Under ordinary principles of contract law, Integrity is liable for all damages that occurred due to its wrongful termination of the insurance contract. Any other result is unfair and contrary to well-established principles of contract law. Therefore, under breach-of-contract rules, Credit Lyonnais should be entitled to file a claim, as damages for Integrity's breach, for an amount equal to each bond's face value less payments already made by Integrity and the investor and future amounts recoverable from the defaulting debtor. Although Credit Lyonnais can file a claim for the entire amount due, it will collect only a small percentage of its claim.[1]

---

[1] The Appellate Division observed that a decision in favor of Credit Lyonnais would actually help Integrity's other policyholders. *Integrity, supra,* 281 *N.J.Super.* at 381–82, 657 *A.*2d 902. Pursuant to the liquidation order, Integrity would pay only a small percentage of each allowed claim (approximately twenty-five cents on the dollar) to the claimant, but it was entitled to collect reinsurance for the entire amount of an allowed claim. Integrity had reinsured at least two-thirds of its liability on surety bonds ($63.5 million out of $99 million). *Supra* at 132, 685 *A.*2d at 1289 . Thus, if this Court allowed claims for the entire $99 million worth of bonds, Integrity would pay out approximately $25 million to the holders of those bonds but would receive $63.5 million in insurance proceeds. The remaining $40 million would then be disbursed among all policyholders by raising the payout to more than twenty-five cents on the dollar.

Recall that Credit Lyonnais made loans to partnerships secured by the promissory notes of investors in the partnerships. From this record it cannot be determined whether some of those investors may have assets capable of covering all or a portion of the outstanding loans. It would be inequitable to permit Credit Lyonnais to pursue recovery from the surety for the face value of the bonds (less payments already received from the surety) due to the partnerships' defaults on their loan payments, without first seeking payment under the promissory notes. On remand Credit Lyonnais will have to show that no recovery is available from the investors.

■ The surety's liability under each irreplaceable bond will be the face value of the bond reduced by both the amount of assets recoverable under the collateral promissory notes and payments already made by the surety and the investor on each bond. Before the trial court, Credit Lyonnais must quantify its loss by providing evidence of the amount of recovery available under the promissory notes.

### III

The Appellate Division held that "[t]he clear language of the Bonds indicates that Integrity was liable at the time of execution and delivery for the full amount under the Bonds, and such amount was reduced if only the investors made their scheduled payments under the Notes." *Integrity, supra,* 281 *N.J.Super.* at 380, 657 *A.*2d 902. The panel also invoked judicial estoppel against Integrity based upon Integrity's prior assertion that the contract's terms imposed liability for the full amount of the bonds prior to termination. We disagree and hold that the bond language demonstrates that Integrity was liable only for payments as missed by the investors and that judicial estoppel should not apply.

We conclude that any policyholder whose insured risk was no longer insurable on the date of default should be entitled to file a claim for the full amount of the policy, less amounts already paid

and amounts recoverable from the debtors. Those policyholders who can purchase alternative insurance should be entitled to file a claim for the cost of that insurance, because that recovery would be sufficient to place them in the same position as before the breach of contract. That rule does not provide coverage for post-termination losses but simply applies general contract rules to value claims on the date of breach.

We affirm the judgment of the Appellate Division and remand the matter to the trial court for further proceedings consistent with this opinion.

SHEBELL, P.J.A.D. (Temporarily Assigned), concurring.

I join in the opinion of the court insofar as it would allow recovery on the surety bonds beyond that permitted by the trial judge, who adopted the special master's recommendation that the lender's claims for post-termination defaults be barred. I also agree that the return of unearned premiums is not required in these circumstances.[2]

I, nonetheless, write to express my accord with the determination of the Appellate Division that "[t]he clear language of the Bonds indicates that Integrity was liable at the time of execution and delivery for the full amount under the Bonds." *Integrity, supra,* 281 *N.J.Super.* at 380, 657 *A.*2d 902. That amount was to be reduced only if the investors made their scheduled payments under the notes. Thus, at the time of Integrity's liquidation, the outstanding balance due on the notes was an absolute obligation because of the default of the investors.

As Integrity (surety) breached its contract with Credit Lyonnais (lender) by filing for and receiving an Order of Liquidation, I find

---

[2] The Appellate Division opinion inadvertently states that "the Chancery Division judge's finding that Integrity is entitled to a return of unearned premiums is reversed because allowance of such would lead to double recovery under Credit Lyonnais's Bonds." Under the Chancery Division's findings it is Credit Lyonnais that would be entitled to the return of the unearned premiums. *Liquidation of Integrity,* 281 *N.J.Super.* 364, 382–83, 657 *A.*2d 902 (App.Div.1995).

no impediment to Credit Lyonnais pursuing a claim for the entire amount of default under the unambiguous language of the bonds. The attorney for the Liquidator made it a point at oral argument to stress that the terms of the bonds were "negotiated for" and that, therefore, the language contained in the agreements' notice provisions should be applied according to its literal terms. Because these are negotiated agreements, there is no reason to disregard the prominent language of the bonds which state that Integrity as surety "is held and firmly bound . . . in the amount of [full amount of bond] for the payment whereof Surety binds itself by, and in accordance with, the conditions hereof."

The notice provision upon which the Liquidator relies for support of his contention that the absolute obligation of the surety at any point in time is only the amount of each installment payment as it becomes due and not paid, reads as follows:

1. (a) Should any investor fail to make a required payment under a Note, exclusive of any amount due by virtue of Lender's right of acceleration, when same shall be due (the Payment Due Date), Lender shall notify Surety of such failure within thirty (30) days of the Payment Due Date.

   (b) . . .

   (c) The Notice, signed by an officer of Lender, shall contain the following information: . . . .

      (iv) Amount of Payment Due and not Paid (exclusive of any accelerated balance) . . .

   (d) Notice sent by Lender as above set forth shall constitute Lender's claim and demand for payment, together with interest from date of default, hereunder and Surety shall be obligated to pay such amount to lender; *provided, however, Surety shall have the right, at its sole option, to require Lender to accelerate the entire balance due under the Note(s), in which case the amount due from Surety shall be such amount, as accelerated. . . .*

2. . . .

3. *The obligation of Surety hereunder is primary, direct and unconditional,* except as set forth herein. . . .

4. *The Premium hereunder shall be payable upon the execution and delivery of this Bond and shall be fully earned and non-refundable from that time.*

5. . . .

6. . . .

7. Notice by Lender with respect to any one default by an Investor shall not exhaust Lender's rights against Surety, and *unless Surety shall have required Lender to accelerate a Note and shall have paid to Lender the full amount of the*

*unpaid balance thereof (if accelerated) with accrued interest,* Lender shall have the right to make successive claims against Surety on each succeeding due date of an installment under a Note....

[Emphasis added.]

It is unnecessary to inquire as to whether either Integrity or Credit Lyonnais actually accelerated the entire unpaid balance due from the debtors. As to both surety and lender, the maxim that "[e]quity regards and treats as done what in good conscience ought to be done" is applicable. *See Martindell v. Fiduciary Counsel, Inc.,* 133 *N.J.Eq.* 408, 413, 30 *A.*2d 281 (E. & A.1943). Further, acceleration would as to both Integrity and Credit Lyonnais be to their advantage and not their detriment as suggested by the dissent. *Post* at 149–150, 685 *A.*2d at 1294. The benefit to Credit Lyonnais is direct and readily apparent. The benefit of acceleration to Integrity, it being in liquidation, arises by virtue of the Liquidator's ability to then proceed against the reinsurers for the full balance due on the notes, thereby aiding all of Integrity's creditors.

Under the terms of the agreements, the surety had "the right, at its sole option, to require Lender to accelerate the entire balance due under the Note(s), in which case the amount due from Surety shall be such amount as accelerated...." As noted by Justice Garibaldi, Integrity's liquidation constituted a breach of the surety contract. *Ante* at 135, 685 *A.*2d at 1290. That breach was not capable of being remedied. In these circumstances, if indeed it is necessary, there is no reason why it should not be presumed that Integrity, as surety, exercised its option to accelerate the entire balance due on the underlying notes, which were clearly in default at that time. *See Schorr 5¢ to $1.00 Stores, Inc. v. Jacob Ellis Realties, Inc.,* 131 *N.J.Eq.* 499, 26 *A.*2d 65 (Ch.1942). The agreements are clear that upon acceleration "the amount due from Surety shall be such amount, as accelerated." I concede that the Appellate Division's reliance on the principle of judicial estoppel was misplaced; nonetheless, Integrity's acts of advancing litigation on its own behalf for the entire amounts due from

debtors reflects that Integrity itself considered the entire balances due pursuant to its right of acceleration.

Further, the fact that Integrity, as surety, had the option to require Credit Lyonnais, the lender, to accelerate the balance due on the notes does not detract from the right of Credit Lyonnais to accelerate the balance due from the debtors upon default. The exercise of reasonable prudence by a lending institution, considering its duty to its own investors, would dictate that Credit Lyonnais accelerate the balances due from the debtors, if not upon their default, then at least upon Integrity's filing for liquidation. Therefore, this court may consider that which should have been done as done. *Martindell, supra,* 133 *N.J.Eq.* at 413, 30 *A.*2d 281. Further, since Integrity provided in the surety agreements that the up-front premium paid to it by Credit Lyonnais "shall be fully earned and non-refundable from [the time of execution and delivery of the Bond]," Integrity's others creditors may not be heard to complain that Credit Lyonnais is receiving favored treatment from the court.

The Liquidator's concession that the risk of default renders the notes uninsurable has been viewed by the Court as a basis to render Integrity liable for an amount equal to the face value of the bonds less payments already made by Integrity and the debtors. However, the court shifts the burden to Credit Lyonnais to prove that it cannot obtain payment under the notes executed by the investors, notwithstanding the fact that the very purpose of obtaining the surety bonds from Integrity was to avoid this burden. In a footnote the Court points out that the Appellate Division observed that because of the availability of reinsurance, a decision in favor of Credit Lyonnais would actually help Integrity's other policyholders (citing 281 *N.J.Super.* at 381–82, 657 *A.*2d 902). *Ante* at 139, 685 *A.*2d at 1292. While the Appellate Division's observation may be perfectly valid with respect to a determination that Integrity is liable for its absolute obligation on the surety bonds, that conclusion is not so clear if, in fact, Integrity's obligation is held to be based on the theory that the damages

awarded are consequential because of the lender's inability to obtain alternate insurance. These two complications are unnecessary and avoidable as Integrity's obligation clearly flows from its contractual liability under the surety agreements.

Therefore, while I join in the decision to affirm the judgment of the Appellate Division, I do so on a different basis than that set forth in the Court's opinion.

HANDLER, J., dissenting.

This case presents the issue of whether, in an insurance-company liquidation proceeding, secured creditors may file claims for the full amount of promissory notes even though not all of the unpaid installments on the notes were actually due and owing on the date that the debt instruments terminated. The relevant statute, the language of the promissory notes, and hornbook concepts of suretyship allow such creditors to file claims only for promissory notes that are due and owing. However, the Court overrides this requirement by holding that "basic principles of contract law" entitle the banks to file claims for the full amounts of the notes. Because the Court deviates from the statute, the language of the notes, and sound principles of suretyship, I respectfully dissent.

I

The rights of claimants against an insolvent insurer are governed by statute. A creditor, such as Credit Lyonnais, may file a proof of claim for claims that "[became] absolute against the insurer on or before the last day fixed for filing proofs of claim." *N.J.S.A.* 17:30C–28(a)(1). The trial court terminated the surety bonds before the deadline for filing proofs of claim. Credit Lyonnais contends that at the time the surety bonds terminated, Integrity owed the entire remaining amount covered by the bonds, including installment payments not yet due.

The parties and the courts below differed sharply over whether the provisions of the surety bonds dictated allowing claims for

amounts not yet due. The issue calls initially for an analysis and interpretation of the terms of the surety bonds in the general framework of suretyship principles.

The legal principles governing suretyships, though fairly complex, are well-settled and generally well-understood. Suretyships involve three parties: the surety (also known as the secondary obligor), the principal (also known as the principal obligor), and the creditor (also known as the obligee). The primary obligation is between the principal and the creditors; it is based on a debt that the principal owes to the creditor. The suretyship is the contractual relation between the surety and the creditor. Under the suretyship agreement, the surety promises the creditor that it will discharge the principal's obligation if the principal fails to do so. The extent of the surety's obligation is ordinarily measured by the principal's liability and cannot exceed it. The primary obligation that forms the basis for the surety's undertaking with the creditor-obligee is between the principal and the creditor. Hence, the essential understanding is that the creditor looks first to the principal rather than the surety to perform the duties of the underlying obligation. Nevertheless, surety contracts can require that the creditor-obligee resort first to the surety for satisfaction of the principal obligation. The surety contract thus may provide that the surety's obligation to the creditor is direct, primary, and absolute.

The suretyship contract itself defines the surety's obligation to the creditor-obligee. According to the suretyship contract, the surety or secondary obligor will have an obligation to the creditor-obligee whenever:

(i) the secondary obligor has a duty to effect, in whole or part, the performance that is the subject of the underlying obligation; or

(ii) the obligee has recourse against the secondary obligor or its property in the event of the failure of the principal obligor to perform the underlying obligation; or

(iii) the obligee may subsequently require the secondary obligor to purchase the underlying obligation from the obligee or incur the duties described in subparagraph (i) or (ii).

[*Restatement (Third) of Suretyship* § 1(2)(b) (Tentative Draft No. 4, 1995) at 48 (hereinafter *Restatement* (Third)).]

According to these general principles, Integrity's obligation to pay Credit Lyonnais does not arise until the investors fail to perform their underlying obligation of making the installment payments. The investors' failure to perform is a condition precedent to Integrity's obligation to pay.

It is also generally understood under suretyship principles that "to the extent that the underlying obligation or the secondary obligation is performed the obligee is not entitled to performance of the other obligation." *Restatement* (Third), *supra*, § 1(2)(c) at 48. Further, a surety's liability will accrue at the same time as the principal's liability. *Am.Jur.* Surety § 141; *C & L Rural Electric Co-op. Corp. v. American Casualty Co.*, 199 *F.Supp.* 220 (E.D.Ark.1961).

The primary standard governing surety relations are the terms and contractual language of the surety bonds. "The duties of the secondary obligor to the obligee are determined by the contract creating the secondary obligation [subject to surety defenses]." *Restatement* (Third), *supra*, § 28(1). We thus look to the terms and conditions of the surety bonds issued by Integrity to determine whether they create an obligation to pay the full bond amount, including the unpaid balances not yet due on the underlying promissory notes.

The surety bonds each provide that:

Integrity Insurance Company ... as Surety (Surety) is held and firmly bound to [Credit Lyonnais] (Lender) in the amount of [Full amount of bond] for the payment whereof Surety binds itself by, and in accordance with, the conditions hereof.

\*        \*        \*        \*        \*        \*        \*        \*

Now, therefore, the condition of this obligation is such that if the investors make all payments in accordance with the payment schedule set forth in each Note, then the obligation is null and void; otherwise, the parties agree as follows:

(1)(a) [If an investor misses a payment,] Lender shall notify Surety of such failure within thirty (30) days of the Payment Due Date.

\*        \*        \*        \*        \*        \*        \*        \*

(c) The Notice, signed by an officer of Lender, shall contain the following information:

\*        \*        \*        \*        \*        \*        \*        \*

(iv) Amount of Payment Due and not Paid (exclusive of any accelerated balance)

\*  \*  \*  \*  \*  \*  \*  \*

(d) Notice sent by Lender as above set forth shall constitute Lender's claim and demand for payment, together with interest from date of default, hereunder and Surety shall be obligated to pay such amount to lender; *provided, however,* Surety shall have the right, at its sole option, to require Lender to accelerate the entire balance due under the Note(s), in which case the amount due from Surety shall be such amount, as accelerated.

\*  \*  \*  \*  \*  \*  \*  \*

(3) The obligation of Surety hereunder is primary, direct and unconditional, except as set forth herein . . . .

(4) The Premium hereunder shall be payable upon the execution and delivery of this Bond and shall be fully earned and non-refundable from that time.

\*  \*  \*  \*  \*  \*  \*  \*

(7) Notice by Lender with respect to any one default by an Investor shall not exhaust Lender's rights against Surety, and unless Surety shall have required Lender to accelerate a Note and shall have paid to Lender the full amount of the unpaid balance thereof (if accelerated) with accrued interest, Lender shall have the right to make successive claims against Surety on each succeeding due date of an installment under a Note . . . .

The surety bonds' preamble states that Integrity is "firmly bound" for the full amount "in accordance with the conditions hereof." Moreover, the succeeding paragraph of the preamble imposes a condition on the obligation that if the investors fully perform, "then the obligation is null and void; otherwise, the parties agree as follows."

The intended meaning of the terms of the surety bond is that reflected in the trial court's interpretation. The body of the surety bond, in section three, defines Integrity's obligation as "primary, direct, and unconditional." That, however, is only a part of the definition of the surety's obligation. The definition includes "exceptions," *viz:* "except as set forth herein." Thus, while the definition initially provides that Integrity would be directly, primarily, and unconditionally bound to Credit Lyonnais to pay the promissory notes even if Credit Lyonnais did not first demand payment from the investors-obligors, the qualification of

that obligation by "except as set forth herein" alters its nature and character.

The Appellate Division did not perceive the language of "except as set forth herein" to modify the apparently unconditional obligation of Integrity to pay Credit Lyonnais. Instead, it held that the first sentence of the preamble was conclusive of Integrity's obligation, particularly when construing ambiguities against paid sureties. 281 *N.J.Super.* 364, 379–80, 657 *A.*2d 902 (1995). A consideration of all of the provisions of the surety bonds, however, reveals that their certain meaning is that Integrity's obligation is conditioned on the investors' actual default on installments as they come due.

The trial court held that the surety owed only the amounts already due. It found that the key to interpreting the extent of Integrity's obligation was the surety bonds' limitation of its obligation to installment amounts actually defaulted. Section 1(d) of the surety bonds provides that "Notice sent by Lender ... shall constitute Lender's claim and demand for payment, together with interest from date of default, hereunder and *Surety shall be obligated to pay such amount* to lender...." (emphasis added).

As noted, the bonds specify that the obligation of the surety is to pay only the amounts of installments actually defaulted. Only those amounts may be included in the creditor's notice of claim and demand for payment. Thus, at the time that the bonds were issued, Integrity was not obligated to pay the full amount of the bonds but only to pay "such amount," namely, that which would be specified in the "Notice sent by Lender." This interpretation is reinforced by the terms set forth in section 1(c)(iv) of the surety bonds. It requires that the Notice list only the "Amount of Payment Due and not Paid (*exclusive of any accelerated balance*)." (emphasis added). Under the bonds, Integrity's obligation to pay was limited to the amount of payments due and not paid, which excludes payments not yet due.

The surety bonds, in section 1(d), do provide that Integrity has an obligation to pay the full bond amount, including amounts not

yet due, whenever Integrity invokes its right to require Credit Lyonnais to accelerate the debt. Thus, under the terms of the bonds, Credit Lyonnais did not have a right to accelerate the debt unilaterally. Under section seven, it had a right only to make successive claims for later missed installments as they came due. That right was extinguished (per section seven) only if "[Integrity] shall have required [Credit Lyonnais] to accelerate a Note and shall have paid to [Credit Lyonnais] the full amount of the unpaid balance thereof (if accelerated) with accrued interest."

This interpretation conforms with the basic contract rule that in an installment contract, a new cause of action arises on the date on which each payment is missed, absent a repudiation. *Metromedia Co. v. Hartz Mountain Assoc.*, 139 *N.J.* 532, 535, 655 *A*.2d 1379 (1995) (citing 4 *Corbin on Contracts* § 951 (1951 & Supp.1994)). An acceleration clause should not be the basis for finding that the entire debt became due on the first missed installment to the detriment of the party having the acceleration right without manifestation of the intent to accelerate the debt. *FDIC v. Valencia Pork Store, Inc.*, 212 *N.J.Super.* 335, 339, 514 *A*.2d 1365 (Law Div.1986), *rev'd on other grounds*, 225 *N.J.Super.* 110, 541 *A*.2d 1098 (App.Div.1988).

The amount of the surety bonds also demonstrates that Integrity was not liable for the full bond amount. The bonds covered not only the investors' initial debt at the time the bonds were issued but also the interest that would accumulate over the following months.[3] Although the surety bonds do not cover the maximum interest amount that the investors would owe, it clearly covered

---

[3] For example, each Keswick partner promised to repay Credit Lyonnais for a loan of $150,000 at 14% interest per annum in four installment payments: $37,500 for the first three years and the remainder by the fourth anniversary of the loan. Integrity's surety bond for the Keswick promissory note was $2,418,-800.04, or $201,566.67 for each of twelve investors. Integrity thereby promised to cover not only the amount that the investors owed at the time they made the bond ($150,000) but additional interest that could accrue over time.

more than the initial debt amount.[4]   It contravenes basic surety-ship principles to hold Integrity liable on the day it executed the surety bonds for the full bond amount even though at that time, the principals did not owe the full amount of the principal obligations. *See* 74 *Am.Jur.*2d Suretyship § 25 ("[T]he liability of the surety is ordinarily measured by the liability of the principal, and cannot exceed it.").

The surety bonds, in section four, deem premiums paid as "fully earned and non-refundable." Those provisions do not define the extent of Integrity's obligation before the investors default.

Taken together, these terms and provisions of the suretyship contracts indicate that Integrity's obligation was intended to be secondary and limited only to the amounts actually due and owing under the principal obligations. The interpretation derived from the language of the preamble that the surety is "firmly bound for the full amount of the bond" is clearly qualified by substantive conditions: "in accordance with the conditions hereof." By denominating the provisions contained in the rest of the surety bonds as "conditions hereof," the surety bonds explicitly limit Integrity's obligation otherwise to pay the entire outstanding bonds. The succeeding paragraph further indicates that the surety's obligation is secondary. Only when the investors do not fully perform is the obligation enforceable. The bond provisions following the preamble define the obligation to pay. Those terms imposed an obligation on the surety only to pay installments not in default or otherwise due and owing if those amounts have been accelerated by the creditor. As noted, however, Integrity never invoked its right to require Credit Lyonnais to accelerate the debt.

The critical interpretive determinations that we should make are that the condition that limits the obligation exclusively to

---

[4] The surety bonds provided coverage for up to $201,566.67. Interpreting the investor's promissory note as accruing interest from August 31, 1984, suggests that the maximum amount owed was $218,801.12. Interpreting the promissory note as accruing interest from the date that it was signed (August 8, 1984), suggests that the maximum amount owed was $234,765.22.

amounts actually due and owing is in the nature of a condition precedent to the surety's secondary obligation and that, in this case, the nature of that condition is itself controlled by the provisions for accelerating the amount of the debt not otherwise due and owing. Several cases involving surety bonds that mandated that the obligation to pay "shall remain in full force and effect" if the principal did not fully perform appear to reach a different result. Those cases are distinguishable or not persuasive on this point of interpretation. *E.g. Amelco Window Corp. v. Federal Ins. Co.*, 127 *N.J.Super.* 342, 317 *A.*2d 398 (App.Div.1974) (holding contractor liable on construction surety bond where parties did not contest whether clause stating that the obligation "shall remain in full force and effect" created a condition precedent or condition subsequent); *In re Liquidation of Wisconsin Surety Corp.*, 112 *Wis.*2d 396, 332 *N.W.*2d 860, 862–64 (Ct.App. 1983) (holding that language of replevin surety bond that provided that insurer and seller were "held and firmly bound unto [the buyer] for which payment [they] jointly and severally bind [themselves]" and that the obligation was "otherwise to remain in full force" was merely a condition subsequent, and was clearly influenced "by the purpose of the replevin bond: to insure that [the buyer] is reimbursed if the seizure, as here, is wrongful"); *In re Liquidation of Wisconsin Surety Corp.*, No. 81–809, 1981 *WL* 139113 (Wis.Ct.App. Dec.28, 1981) (unpublished) (holding, in case of surety bond issued to bank covering obligation of corporate lender to repay loan, that bond provision that principal and surety were "held and firmly bound unto" the bank "jointly and severally, firmly by these presents" and that if principal paid the loan "then this obligation shall be null and void; otherwise it shall remain in full force and effect" for principal that had not been defaulted before bankruptcy, was condition precedent, thereby barring claim against insurance company). In contrast to these decisions, Integrity's surety bonds do not provide that the obligation "remain in full force and effect." Rather, they provide that "the parties agree as follows."

We would not need to decide how to interpret the surety bonds had they provided that the obligation "shall remain in full force and effect." A straightforward reading of the terms of the surety bonds, however, demonstrates that Integrity's obligation to pay is conditioned on Credit Lyonnais's providing notice of defaulted payments. The literal, though admittedly not plain, meaning of the surety bonds is that, absent acceleration of the debt, Integrity bound itself to pay only the amounts that investors had already failed to pay. Therefore, Credit Lyonnais's claim for installment payments that were due after the bonds terminated should be denied.

## II

In spite of the bond language and fundamental principles of suretyship, the Court concludes that Credit Lyonnais is entitled to the entire outstanding bond amount as a measure of contractual damages. The Court's analysis is flawed, however, in that contract principles allow recovery only for claims that already exist, namely, claims that are currently due and owing. Moreover, by allowing Credit Lyonnais to recover in contract for amounts that were not due and owing on the date of the termination of the bonds, the Court greatly prejudices the legitimate contractual claims of other creditors, whose claims *were* due and owing on the termination date.

The trial court ruled that the appropriate damage award was a return of unearned premiums. That ruling was based on the court's determination that Credit Lyonnais was entitled to recover under the surety bonds only the amount of defaulted installment payments and not the entire amount of the bonds representing the unpaid balance of those underlying obligations. The Appellate Division did not consider this issue when reversing on other grounds. Contrary to the Court's analysis, the trial court was surely correct in determining that the proper award is a return of unearned premiums, not the cost of reinsurance.

154

The issue here is what damages are appropriate for Credit Lyonnais when the Liquidation Order terminated the surety bonds. Claims can be made "in the nature of damages for a breach of contract" only for claims that existed at the time that the insurance company was declared insolvent. 19A J. Appleman, *Insurance Law and Practice* § 10721 at 196 (rev. ed. 1982). As discussed previously, Integrity did not owe the full bond amount at the time of liquidation. *See supra* at 148–153, 685 *A*.2d at 1297–1299.

Claims that arise after insolvency are not recoverable. "When an insurance company is adjudicated insolvent[,] ... its right to continue business ceases and all of its outstanding liability is canceled by operation of law, *except* claims of its policyholders for unearned premiums and cash surrender values of policies." Appleman, *supra,* § 10729 at 260. The surety bonds in this case do not have any cash surrender value. Credit Lyonnais's appropriate remedy, therefore, is a return of unearned premiums. *Newman v. Hatfield Wire & Cable Co.,* 113 *N.J.L.* 484, 174 *A.* 491 (E & A 1934); *Broadway Bank & Trust Co. v. New Jersey Property–Liability Ins. Guaranty Ass'n,* 146 *N.J.Super.* 80, 368 *A.*2d 983 (Law Div.1976); *State v. American Bonding & Casualty Co.,* 206 *Iowa* 988, 221 *N.W.* 585 (1928); *Moren v. Ohio Valley Fire & Marine Ins. Co.'s Receiver,* 224 *Ky.* 643, 6 *S.W.*2d 1091 (1928); *Green v. American Life & Accident Ins. Co.,* 112 *S.W.*2d 924 (Mo.App.1938); *cf. Tuttle v. State Mut. Liability Ins. Co.,* 2 *N.J. Misc.* 973, 127 *A.* 682 (Ch. Ct.1924) (applying same principle to mutual insurance company where policy so provided). Return of unearned premiums is the appropriate award even if the policy does not appear to provide for such refunds. *See Johnson v. Button,* 120 *Va.* 339, 91 *S.E.* 151 (1917). Even if some loss "occurs following the dissolution proceedings, the recovery of the policyholder will be limited to a return of unearned premiums." Appleman, *supra,* § 10729 at 264; *see Smith v. National Credit Ins. Co.,* 65 *Minn.* 283, 68 *N.W.* 28 (1896) (noting same in dicta in credit insurance case).

The appropriate remedy, therefore, is to refund the unearned premiums as determined by the formula set out in the proceedings below. Such a remedy, in addition to being legally correct, reflects the risk for which the various creditors contracted and does not award Credit Lyonnais a windfall by drastically reducing its risk as embodied in the language of the promissory notes.

### III

Although the Court claims to champion "basic principles of contract law," it does nothing of the sort. Instead, it allows one creditor to file claims for amounts not due and owing on the date of termination while ensuring that other creditors will collect far less on their claims for amounts that *were* due and owing. To skew the allocation of risk reflected in the bond language deviates from the creditors' reasonable expectations in entering into relationships with Integrity. The Court's emphasis on Credit Lyonnais's inability to procure replacement insurance for less than the full amount of the debt is misplaced because creditors who assume a risk (as per the language of the bond instrument) are not entitled to be reimbursed for replacement insurance when that risk does not pan out.

Moreover, while "basic principles of contract law" do not support the Court's conclusion, basic principles of suretyship decidedly point to an opposite conclusion, namely, that a surety is liable only for a debt that is already owing.

For the foregoing reasons, I respectfully dissent.

O'HERN, J., joins in this opinion.

PORITZ, C.J., and POLLOCK, J., did not participate.

*For affirmance and remandment*—Justices GARIBALDI, STEIN, COLEMAN, SHEBELL and LONG—5.

*Opposed*—Justices HANDLER and O'HERN—2.