281 N.J. Super. 364 (1995)
657 A.2d 902
IN THE MATTER OF THE LIQUIDATION OF INTEGRITY INSURANCE COMPANY.
Superior Court of New Jersey, Appellate Division.
Submitted February 27, 1995.
Decided May 12, 1995.
*367 Before Judges DREIER, VILLANUEVA and BRAITHWAITE, JJ.
Shanley & Fisher and Bower & Gardner, attorneys for appellant/cross-respondent Credit Lyonnais (Saretsky, Katz & Dranoff, Barry G. Saretsky and Scott S. Greenspun, of counsel; Susan M. Sharko, on the brief).
Sills Cummis Zuckerman Radin Tischman Epstein & Gross, attorneys for respondent/cross appellant The Commissioner of Insurance of the State of New Jersey, in his capacity as Liquidator of Integrity Insurance Company (Thomas S. Novak, of counsel; Stuart Rosen, on the brief).
McElroy, Deutsch & Mulvaney, attorneys for surety reinsurers Allstate Insurance Company, Resolute Reinsurance Company and Skandia America Reinsurance Corporation, (James M. Mulvaney, of counsel; Margaret F. Catalano, on the brief)[1].
The opinion of the court was delivered by VILLANUEVA, J.A.D.
Claimant, Credit Lyonnais, the obligee bank under surety bonds issued by Integrity Insurance Company (Integrity), later declared insolvent, appeals without leave granted from an order of the Chancery Division declaring that the Liquidator of Integrity, because of Integrity's insolvency, properly disallowed so much of Credit Lyonnais' proofs of claim that sought indemnification for sums due under promissory notes guaranteed by Integrity's bonds upon which there were defaults by investors after the termination of Integrity's bonds.
Credit Lyonnais asserts that its damages should be measured by the equitable value of the bonds (net amount due) on the date of Integrity's insolvency because the insolvency constituted an anticipatory breach of the surety agreement. The Commissioner *368 of Insurance of the State of New Jersey in his capacity as Liquidator of Integrity (Liquidator) cross-appeals, arguing that if this court reverses the trial court order and thus holds that Credit Lyonnais is entitled to coverage for post-termination defaults, we should also reverse that portion of the order declaring that Credit Lyonnais is entitled to the return of a portion of its premium. The three surety reinsurers seek to have the Chancery Division order affirmed.
During the years of 1984 and 1985, certain investors  limited partners  became indebted to limited partnerships, which indebtedness was evidenced by promissory notes (Notes). The Notes were assigned by the limited partnerships to appellant Credit Lyonnais as collateral for the loans it made to the partnerships; thus, the investors became obligated to make payments under the Notes directly to Credit Lyonnais. The Notes required the investors to make payments in accordance with a schedule set forth in each Note. The last scheduled payment under any of the Notes became due on November 30, 1989.
Integrity, a New Jersey stock insurance company that issued various types of insurance policies as well as surety bonds, issued to Credit Lyonnais many investor financial surety bonds (Bonds) to protect Credit Lyonnais against the risk of an investor defaulting on the loans made by it to the partnerships. In re Integrity Insurance Co., 251 N.J. Super. 501, 502, 598 A.2d 940 (Ch.Div. 1991). The Bonds provide that Integrity is "firmly bound" to Credit Lyonnais in the amount of the limit of liability of the Bonds, which is the total amount of the investors' indebtedness to Credit Lyonnais under the Notes. Each Bond also provides that the premium "shall be payable upon the execution and delivery of this Bond and shall be fully earned and non-refundable from that time." The Bonds are the subject of this appeal.
On March 24, 1987, the Chancery Division issued an Order of Liquidation (Liquidation Order) pursuant to which Integrity was adjudicated insolvent. This order, which was amended and supplemented by the court's March 25, 1987 order, provided that *369 coverage under all of Integrity's policies, bonds and other contracts of insurance was terminated as of April 24, 1987.
The Liquidator was directed to give notice to all recorded policyholders and known claimants against Integrity and its insureds for (1) any known claims; (2) circumstances that could reasonably expect to give rise to future claims; and (3) unasserted claims in order to reserve the right to assert future claims against Integrity.
Pursuant to a supplementary order filed on July 8, 1987, upon receipt of a Proof of Claim (POC), the Liquidator was to issue a Notice of Determination (NOD) which either allowed or denied the POC. Rejected claimants were given sixty days to file an objection to the NOD. Once an objection was filed, the Liquidator could affirm or modify the prior NOD. If no objection was filed the NOD became the final judgment of the Superior Court.
Pursuant to the Liquidation Order, the Liquidator received an estimated 856 POCs for claims arising from the Bonds issued by Integrity.[2] The Liquidator denied coverage for all defaults by limited partners that occurred after the Bonds were deemed terminated by the Liquidation Order. The Liquidator also denied claims for the return of premiums on the ground that the Bonds provided that the premiums were fully earned upon the issuance of the Bonds.
On September 21, 1989, the Chancery Division judge appointed a Special Master to hear objections to the NODs. In April 1990, the Liquidator filed a motion for summary judgment before the Special Master seeking an order (1) disallowing all POCs to the extent they sought a return of premiums; (2) disallowing all POCs to the extent they sought damages for defaults on bonded obligations where the default occurred after April 24, 1987; and (3) a declaratory judgment disallowing all POCs to the extent they sought to obtain payment from the estate notwithstanding that the *370 lending institutions (obligees) released their claims against bonded principals or received an adverse adjudication thereof. The motion was supported by the surety reinsurers and was opposed by Credit Lyonnais as well as other entities.
After oral argument, the Special Master recommended and ruled that claims for unearned premiums would be allowed; however, he did not decide each claim on the merits. He next granted that portion of the Liquidator's motion seeking a disallowance of all POCs to the extent they sought damages for defaults by limited partners under the Notes where the defaults occurred after April 24, 1987, and denied the corresponding cross-motions that were filed in opposition to this motion. Finally, the Special Master denied without prejudice the portion of the Liquidator's motion seeking a declaratory judgment disallowing all POCs to the extent they sought to obtain payment from the estate notwithstanding that the obligees released their claims against the bonded principals.
On or about September 24, 1991, The Liquidator, Credit Lyonnais and other claimants filed objections in the Chancery Division concerning different aspects of the Special Master's ruling. Credit Lyonnais requested that the court (1) reject that part of the Special Master's order disallowing certain POCs; (2) deny the Liquidator's summary judgment motion; and (3) allow Credit Lyonnais' POCs against Integrity's estate.
On October 6, 1992, the Chancery Division judge first held that the Special Master properly concluded that Integrity's estate was not liable for post-termination defaults, reasoning that it is "well-established law in New Jersey that the entry [of] a liquidation order terminates coverage under the insurer's outstanding policies. See Mayer v. Attorney General, 32 N.J. Eq. 815 (E. & A. 1880); Gray v. Reynolds, 55 N.J. Eq. 501 (E. & A. 1887 [37 A. 461])." The court also determined that the Special Master properly found that Integrity's obligation under the Bonds arose whenever an investor failed to make a scheduled payment to a lender, and that this obligation was terminated as of April 24, *371 1987; "[a]ll claims for defaults on monthly payments after that date were correctly denied ... for the reason that they were not mature and a valid existing obligation...."
The court next held that all bond obligees were entitled to a return of unearned premiums. The court stated that with respect to the method of calculation, the question is whether a pro rata method (i.e. so much per year) should be applied, or whether a declining balance method should be applied, a method which realizes that the number of required payments lessened in each subsequent year. The court stated that it would determine the method of calculation at a later time.
The court also addressed the Liquidator's request for the court to determine the effect, if any, of a release or settlement upon an obligee's claim for an unearned premium, as well as on the bond. The court ruled that there is no connection between a financial surety bond claimant's right to unearned premium and a release or settlement between the bond claimant and the bond principals, and therefore ordered the Liquidator to allow all financial surety claims without regard to whether the claimant compromised obligations or settled. The court reasoned that the "value of the insurance policy was lost and whether ... the bond was paid or not, is really irrelevant to that."
The court next discussed the issue as the effect of a settlement or a release on claims for defaults occurring after the cut-off date. The court recognized that Integrity had "gone forth for certain claimants" when Integrity had claims for its own payout and claims for uncollected portions of premium, and collected for the claimant as well as itself, and in some cases, just for itself. The judge also recognized that this increased the monies available for distribution by reducing claims against the estate. Acknowledging that the fact pattern was different in each case, the court stated that there were many factors involved in resolving whether the issuance of a release by a claimant to one of the investor bondholders would defeat a claim. The court concluded that to the extent that the settlement was for the benefit of the estate it *372 would not bar the claim except as adjusted by the benefit, and that if it was not for the benefit of the estate and an obligee was released, then the claim should fall. The court then listed the criteria to be considered in determining the effect, if any, of any release or settlement by an obligee, and indicated that the critical question was whether the settlement was fair. The judge added that he knew settlements had been made and whether they were fair were fact-sensitive determinations that he would not make. The guidelines were for the Special Master to use in resolving these issues. Thus, the judge denied the Liquidator's motion with regard to these matters.
On November 10, 1992, the judge signed an order adopting the recommendation of the Special Master, which stated that similarly situated bond obligees were entitled to recover unearned premiums in accordance with N.J.S.A. 17:30C-26(c). The Special Master was also ordered to conduct a hearing to resolve the issue of calculation of unearned premiums.[3]
On April 29, 1994, the judge signed an order accepting the recommendation of the Special Master, which stated that the Liquidator's recommended allowance of the claims for unearned premium by the obligees of the Bonds based upon the declining balance method was approved.
On June 9, 1994, Credit Lyonnais appealed only from the portions of the November 10, 1992 and April 29, 1994 orders which granted the Liquidator's motion for summary judgment and confirmed the disallowance of Credit Lyonnais' POCs to the extent they sought a distribution for post-termination defaults by investors under the Notes. The Liquidator cross-appealed from that portion of the November 10, 1992 order which denied the Liquidator's motion to the extent that it sought a declaration that the surety bond obligees were not entitled to any unearned premiums. The Liquidator requests that the order be affirmed in so far as it *373 denied coverage for post-termination defaults. Alternatively, pursuant to his cross-appeal, if the order is reversed the Liquidator requests that all claims for the return of Credit Lyonnais' premium be denied. The surety reinsurers agree with the Liquidator's position.

I.
We first note that this matter is not properly before the Appellate Division because the parties are not appealing and cross-appealing from a final judgment. See R. 2:2-3; Yuhas v. Mudge, 129 N.J. Super. 207, 209, 322 A.2d 824 (App.Div. 1974). Neither the April 29, 1994 order nor the November 10, 1992 order was final as to all issues and all parties. For example, the judge ordered that bond obligees were entitled to recover unearned premiums but did not decide the merits of any claims, and further remanded the matter to the Special Master to conduct a factual hearing to resolve the calculation issue. Therefore, bond obligees may still appeal a future determination made as to them. With regard to the issue of whether the Liquidator is responsible for post-liquidation defaults, the record does not contain any specific amounts currently due and owing; Credit Lyonnais merely states that all the notes were in default when Integrity was adjudicated insolvent. Therefore, leave to appeal should have been sought. Yuhas, supra, 129 N.J. Super. at 209, 322 A.2d 824. However, because of the importance of this case, the age of this case, and the number of interested parties, we will treat the appeal as a notice for leave to appeal, R. 2:2-4, and grant it nunc pro tunc.

II.
Credit Lyonnais questions the surety reinsurers' standing to file briefs in connection with this appeal because the surety reinsurers  Allstate Insurance Company, Resolute Reinsurance Company and Skandia America Reinsurance Corporation  were not parties to the Liquidator's motion for summary judgment nor *374 are they parties to the Bonds which are the subject of this appeal. We agree that the reinsurers do not have standing to participate in this appeal. See Pressler, Current N.J. Court Rules, comment on R. 2:3-4 ("Ordinarily a respondent must cross-appeal in order to obtain relief from the judgment."). As a result, the issues raised by the reinsurers will be addressed only to the extent that the same issues are raised by the Liquidator or Credit Lyonnais.

III.
Suretyship is a contractual relation whereby one person or entity, the surety, agrees to be answerable for the debt or default of another, the principal. 74 Am.Jur.2d Suretyship § 1. The relationship created by the suretyship agreement is a "tripartite one between the party insured, the principal obligor, and the surety." Id. at § 3. The surety's obligation is said to be accessory or collateral, not direct, to the principal's obligation, but the obligation to the creditor or obligee of the principal is said to be "direct, primary, and absolute." Id. at § 1. Stated another way, suretyship is a direct contract to pay the principal's debt if there is a default, but this liability is terminated immediately and completely if the principal pays or performs. 72 C.J.S. Principal & Surety § 2 (1987); see also id. at § 70 ("As far as the holder of the bill or note is concerned, the liability of a surety is a `primary' liability as distinguished from a `secondary' liability.").
The Bonds at issue provide in pertinent part as follows:
Integrity Insurance Company ... as Surety (Surety) is held and firmly bound to Credit Lyonnais ... in the amount of [total of investors' debt] for the payment whereof Surety binds itself by, and in accordance with, the conditions hereof.
WHEREAS:
The persons named in Schedule A ... became indebted to [X limited partnership].... Such indebtedness was assigned or pledged by the Partnership to the Lender, and is evidenced by Promissory Notes (individually called Note and collectively Notes) from the investors to the Partnership....
NOW, THEREFORE, the condition of this obligation is such that if the investors make all payments in accordance with the payment schedule set forth in each Note, then this obligation shall be null and void; otherwise, the parties agree as follows:

*375 1. (a) Should any investor fail to make a required payment under a Note, exclusive of any amount due by virtue of Lender's right of acceleration, when same shall be due (the Payment Due Date), Lender shall notify Surety of such failure within thirty (30) days of the Payment Due Date.
(b) Such notice shall be in writing sent to Surety.... Notice shall be deemed given to Surety when received by Surety.
(c) The Notice, signed by an officer of Lender, shall contain the following information:
(i) Name and address of defaulting investor
(ii) Name of Partnership
(iii) Payment Due Date
(iv) Amount of Payment Due and not Paid (exclusive of any accelerated balance)
(v) Per diem interest from Payment Due Date
(d) Notice sent by Lender as above set forth shall constitute Lender's claim and demand for payment, together with interest from date of default, hereunder and Surety shall be obligated to pay such amount to Lender; provided, however, Surety shall have the right, at its sole option, to require Lender to accelerate the entire balance due under the Note(s), in which case the amount due from Surety shall be such amount, as accelerated.
(e) Payment due from Surety pursuant to a notice and claim received by Surety shall be paid within thirty (30) days after receipt of such notice from Lender.
* * * * * * * *
(g) In the event that Surety pays Lender as provided herein with respect to any Note, Lender shall, simultaneously with such payment, assign to Surety the Note and all its rights thereunder, with respect to the amount paid, without recourse, liability or warranty....
* * * * * * * *
3. The obligation of Surety hereunder is primary, direct and unconditional, except as set forth herein....
4. The Premium hereunder shall be payable upon the execution and delivery of this Bond and shall be fully earned and non-refundable from that time.
* * * * * * * *
7. Notice by Lender with respect to any one default by an Investor shall not exhaust Lender's rights against Surety and, unless Surety shall have required Lender to accelerate a Note and shall have paid to Lender the full amount of the unpaid balance thereof (if accelerated) with accrued interest, Lender shall have the right to make successive claims against Surety on each succeeding due date of an installment under a Note. Surety shall be subrogated to the rights of Lender under any Note only to the extent of principal and interest paid thereon by Surety to Lender....
*376 Credit Lyonnais generally argues that the Chancery Division's November 10, 1992 Order should be reversed because it "fails to give effect to those provisions of the Bonds which clearly provide that Integrity's obligation to pay Credit Lyonnais the entire amount of the unpaid indebtedness under the Notes became a primary, direct and unconditional obligation as soon as the Bonds were executed and delivered."
Credit Lyonnais argues that its claims against Integrity are not limited to the cost of replacement insurance because replacement insurance would not have been available. By March 24, 1987, all of the Notes were already in default; consequently, according to Credit Lyonnais, it would have been impossible for Credit Lyonnais to obtain replacement bonds to protect itself against post-liquidation defaults "because investor default was no longer an insurable risk, it was a certainty." The Liquidator now acknowledges that replacement insurance was unavailable once Integrity became insolvent.
Credit Lyonnais additionally argues that before Integrity was placed into liquidation it had commenced litigation against defaulting investors on notes similar to those executed in favor of Credit Lyonnais. In those proceedings, Integrity claimed that its damages from a default on one installment was the entire remaining indebtedness due under the note, not just the missed installment. This clearly shows that, prior to its liquidation, Integrity acted under the assumption that once an investor defaulted on an installment, the investor would continue to default. Specifically, Integrity posited in previous litigation proceedings that a default on one installment under a note justifies damages equal to the remaining balance due.
The doctrine of judicial estoppel applies here to prevent Integrity, through its Liquidator, from asserting a contradictory position in this action. See Levin v. Robinson, Wayne & La Sala, 246 N.J. Super. 167, 178, 586 A.2d 1348 (Law Div. 1990). This equitable doctrine applies when a litigant attempts to take inconsistent legal positions and serves to protect the integrity of the judicial process. *377 Id. at 179, 586 A.2d 1348. The doctrine applies herein because the Liquidator claims that if a payment under a Note was missed, Integrity was only liable for that payment, whereas in previous litigation, Integrity alleged that one default constituted a repudiation of the entire balance due under the note.
The sole issue in this case is the measure of damages to which Credit Lyonnais is entitled. Credit Lyonnais argues that pursuant to the terms of the Bonds, Integrity's obligation for the full amount of the Bonds arose the moment the Bonds were executed and delivered to Credit Lyonnais. Credit Lyonnais concludes that because replacement bonds were unavailable, its damages equal the remaining indebtedness under the Notes. We agree with Credit Lyonnais that the correct measure of damages is the entire sum of the Bonds minus any payments already made by investors under the Notes or payments made by Integrity to Credit Lyonnais under the Bonds.
The Liquidator argues that in Gray v. Reynolds, 55 N.J. Eq. 501, 37 A. 461 (E. & A. 1887), the court rejected the proposition that damages may be recovered for defaults occurring after termination of surety bonds when replacement bonds are unavailable. In Gray, the United States Credit System Company (Company) issued certificates of guarantee to traders for losses incurred by customers who were indebted to the traders and later became insolvent. Id. at 501-02, 37 A. 461.
The complainants presented claims for losses on goods, some of which were incurred after the Company's insolvency. Ibid. The losses incurred after the insolvency were disallowed by the receiver. Ibid. The court posited that the liquidation put an end to the business and terminated its contracts. Id. at 503, 37 A. 461. The court reasoned that "[a]ny other view would compel the creditors of the company to continue the insurance business with the property and funds of the company, which the insolvency proceedings contemplate shall be divided among the creditors as of the time when the insolvency occurred." Id. at 503-04, 37 A. 461. Regarding the insureds' damages, the court held that "where no *378 provable loss had occurred at the time of the insolvency, [compensation] would be by a rebate of that portion of the premium which represented the unexpired term of the policy." Id. at 504, 37 A. 461.
In Gray when the certificates of guarantee were issued, there was no primary obligation by the bonding company. It arose only when goods were sold during that year and losses were sustained by the insured by the insolvency of their customers during that year. The court stated this was a peculiar arrangement, protected as its exclusive property by a copyright, where "there is no reserve fund to meet the obligations it occurs, no surrender value and no opportunity for reinsurance in other companies." Id. at 502, 37 A. 461. Herein, whether or not Integrity set up a reserve, it could have. More importantly, there was an opportunity for reinsurance in other companies which Integrity did in fact consummate. In fact, the reinsurers, although not direct parties, are apparently the ones who stand to gain or lose the most in this litigation. In addition, Integrity, from the outset when it demanded and received a non-refundable premium to guarantee an outstanding indebtedness, made a primary, direct and unconditional promise to pay a specific amount subject to reduction only if investors made payments as they had been scheduled.
Here, no replacement bonds would have been available. In addition, Integrity earned its premium when it issued the bonds and the premium was non-refundable from that time. In any event, Gray is not dispositive here because that case merely stands for the general proposition that an insurance company's insolvency terminates its contracts and policies. Id. at 503-04, 37 A. 461; see also 19A Appleman on Insurance Law & Practice § 10721 (1982) ("A final decree of dissolution of an insolvent company renders it incapable of carrying out its contracts, and its policyholders are present creditors to the amount of the equitable value of their respective policies....").
Whether Integrity's insolvency terminated its policies is not the issue here because that is clear; the issue is whether at the time *379 the Bonds were issued to Credit Lyonnais, Integrity became liable for the entire amount under the Bonds (total of investors' indebtedness) or whether Integrity was only liable for individual installments as they were missed. If Integrity became liable for the entire amount of the Bond at issuance, it is irrelevant whether payments were missed after Integrity was placed into liquidation because Integrity became liable for the entire remaining indebtedness before the insolvency. On the other hand, if Integrity became liable for individual installments only after there was a default, then the Liquidator is correct in asserting that it is not liable for defaults occurring after the date of insolvency.
The liability of Integrity is measured by the contract or Bond. 72 C.J.S. Principal & Surety § 73a. General contract construction principles apply so that the terms of the contract are to be understood in their plain, ordinary sense. 74 Am.Jur.2d Suretyship § 26. The contract is to be considered as a whole, and its provisions are to be read together. Ibid. Also, the contract is to be construed so as to give effect to the parties' intentions, as gathered from the language of the Bond given the surrounding circumstances. Ibid.; 72 C.J.S. Principal & Surety § 82.
Paid sureties, such as Integrity, are considered to be in the business of insurers, and their obligation is to be liberally construed in accordance with the rules applicable to insurance policies. 72 C.J.S. Principal & Surety § 83b. Thus, any ambiguities should be resolved in favor of the insured and against the paid surety. Ibid.; see American Surety Co. v. Hutchinson, 63 F.2d 536, 538 (5th Cir.1933) ("Under the well-established rule, the bond is to be construed most strongly against [the surety]."); c.f. Hartford Fire Insurance Co. v. Riefolo Construction Co., 81 N.J. 514, 518, 525-26, 410 A.2d 658 (1980) (In a case that apparently involved compensated sureties, the Court stated that suretyship contracts should be construed in favor of the surety, reasoning that performance bonds issued to the contractor are primarily for *380 the benefit of the individual for whom the work is being performed.).
The Bonds herein provided in pertinent part:
Integrity Insurance Company ... as Surety ... is held and firmly bound to Credit Lyonnais ... in the amount of [total of investors' debt] for the payment whereof Surety binds itself by, and in accordance with, the conditions hereof.
WHEREAS:
The persons named in Schedule A ... became indebted to [X Limited Partnership]....
NOW, THEREFORE, the condition of this obligation is such that if the investors make all payments in accordance with the payment schedule set forth in each Note, then this obligation shall be null and void; otherwise, the parties agree as follows....
[emphasis added.]
The clear language of the Bonds indicates that Integrity was liable at the time of execution and delivery for the full amount under the Bonds, and such amount was reduced if only the investors made their scheduled payments under the Notes. This interpretation is bolstered by the fact that Integrity was a compensated surety, so even if this language is determined to be ambiguous, the ambiguity should be resolved in favor of the insured, Credit Lyonnais. 72 C.J.S. Principal & Surety § 83b.
Other provisions of the Bonds also support this interpretation. For example, the Bonds provide that "[t]he obligation of Surety hereunder is primary, direct and unconditional, except as set forth herein." That language means exactly what it says. Amelco Window Corp. v. Federal Insurance Company, 127 N.J. Super. 342, 344-46, 317 A.2d 398 (App.Div. 1974), involved an action by a subcontractor against the prime contractor's surety to recover payment due. That surety agreement stated: "THE CONDITION OF THIS OBLIGATION IS SUCH, that if the above bounden Principal ... shall well and truly keep, do and perform each and every ... matter[] ... in said contract ... or shall pay over, made good and reimburse to the above named Obligee ..., all loss and damage which said Obligee must sustain by reason of failure or default on the part of said Principal so to do, then this obligation shall be null and void; otherwise shall remain in full *381 force and effect." Id. at 345, 317 A.2d 398. We determined that under this bond, the surety's obligation to the creditor of the principal was direct, primary and absolute, reasoning that the purpose of a surety contract is to insure that the principal fulfills the contract so that the obligee does not have to do it. Id. at 346, 317 A.2d 398. To hold otherwise would cause a total failure of consideration.
Also supporting Credit Lyonnais' interpretation of the Bonds is the following provision: "4. The Premium hereunder shall be payable upon the execution and delivery of this Bond and shall be fully earned and non-refundable from that time." The reason for the premium being nonrefundable is that Integrity was fully obligated at that time to reimburse Credit Lyonnais for the total amount of the Bond. Insurance is an agreement pursuant to which a person or entity for a consideration (premium) promises to pay money for the loss of something by specified perils. 43 Am.Jur.2d Insurance § 1. Under some circumstances, the measure of damages for an insured when the insurance company becomes insolvent is a return of unearned premium. Gray v. Reynolds, supra, 55 N.J. Eq. at 504, 37 A. 461; Appleman on Insurance Law & Practice, supra, at § 10721. The Bonds at issue here, however, clearly state that the premiums were fully earned at the time of execution; therefore logic dictates that because the premiums are deemed fully earned and non-refundable, Integrity was compensated for its liability for the entire indebtedness under the Notes at the time of execution.
Furthermore, it is clear that Integrity considered this a primary obligation because it reinsured the risk of defaults. In fact, when the Chancery Division judge attempted to fashion an equitable relief he apparently did not realize that the main benefactor of his decision would be the reinsurers[4] to the detriment of Credit *382 Lyonnais. The judge fashioned his relief without considering the potential harm to Integrity. It is easy to understand why the surety reinsurers who escaped liability filed briefs on this appeal to which they were not a party.
We find that Integrity became liable for the entire amount of the Bonds at the time of issuance. Therefore claims for this amount should have been allowed less any payments made by creditors before or after the insolvency. Obviously at the time of the Judge's decision, the amount of these claims was known because all Notes matured or defaulted years earlier.
In In re Integrity Insurance Co., supra, 251 N.J. Super. at 507-08, 598 A.2d 940, the judge held that surety bonds are equivalent to insurance policies under the New Jersey Insurers Liquidation Act; consequently, surety bond claimants are entitled to fourth priority distribution (claims of insureds), not fifth, which is the category of "[a]ll other claims," under N.J.S.A. 17:30C-26(c). The fact that we have determined that Credit Lyonnais is entitled to make a claim for the entire net amount due under the Bonds does not mean it will necessarily receive this amount because Credit Lyonnais will not, as the Liquidator argues, be preferred. Credit Lyonnais will still have to stand in line along with all other claimants for the distribution of Integrity's assets, N.J.S.A. 17:30C-26(c), although it might also have a basis for a claim against the surety reinsurers. Once the claims are paid, the Liquidator would of course also succeed to the surety's rights for reimbursement against the limited partnership.
Those portions of the November 10, 1992 and April 29, 1994 orders that denied Credit Lyonnais' claims for post-insolvency defaults by creditors are reversed and the matter remanded for further proceedings consistent herewith.
Consequently, that part of the Chancery Division judge's finding that Integrity is entitled to a return of unearned premiums is *383 reversed because allowance of such would lead to double recovery under Credit Lyonnais's Bonds.
NOTES
[1] See infra, at 374, 657 A.2d at 906 discussing surety reinsurers' lack of standing.
[2] A total of about 26,000 claims were filed against Integrity. In re Integrity Insurance Co., supra, 251 N.J. Super. at 502, 598 A.2d 940.
[3] The motion additionally denied without prejudice another bond obligee's motion for attorney fees.
[4] It would be fair to assume that because the reinsurance was underwritten by three substantial companies, it reinsured all or substantially all of Credit Lyonnais' claims. The record also does not disclose that the Liquidator attempted to recover any of the premiums that Integrity paid for this reinsurance.