**UNITED STATES of America for the Use of DON SIEGEL CONSTRUC-TION CO., INC., Plaintiff,**

v.

**ATUL CONSTRUCTION CO., and Harleysville Insurance Company, Defendants.**

No. CIV.A. 99–0321 JEI.

United States District Court, D. New Jersey.

March 1, 2000.

Simon & Demeter by Michael S. Simon, Trenton, NJ, for Plaintiff.

Nicholas Khoudary, Brunswick, NJ, for Defendant Atul Construction Co.

Borrelle, Ballard, Caruthers & Search by Robert J. Borelle, Sr., Moorestown, NJ, for Defendant Harleysville Insurance Co.

## OPINION

IRENAS, District Judge.

Presently before the Court is defendant Harleysville Insurance Company's ("Harleysville") motion for partial summary judgment. The Court has subject matter jurisdiction over this case because plaintiff is asserting claims under the Miller Act, 40 U.S.C. § 270(a) *et seq.* *See* 28 U.S.C. § 1331. The Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367. For the reasons set forth below, this motion is denied.

### I.

Defendant Atul Construction Company ("Atul") was hired by the United States of America to replace water lines at Fort Dix, New Jersey. The project was known as the "Garden Terrace, Water Line Replacement Project." (Complaint, ¶ 4). On or about November 27, 1997, Atul contracted with plaintiff Don Siegel Construction Company ("plaintiff" or "Siegel") to provide labor on the project. (*Id.* at ¶ 7). In accordance with this contract, Atul was to provide plaintiff with all necessary materials. (*Id.*)

Plaintiff brought this suit pursuant to the Miller Act, 40 U.S.C. § 270a *et seq.* The Miller Act "governs the payment rights of persons who supply labor and material for the construction of most Federal construction projects." *U.S. ex rel New Deal Plumbing Supp. Co. v. Nazon,* No.Civ.A. 98–2083, 1999 WL 988729, at *2 (D.N.J. Oct.22, 1999). Under the Act, a prime contractor having a contract in excess of $25,000.00 must post a payment bond with a surety. The purpose of the bond is to ensure that all persons supplying labor and material to the prime contractor are paid for their services. The Act has been construed liberally "to protect those whose labor and materials go into public projects." *J.W. Bateson Co. v. United States ex rel. Bd. of Trustees of Nat. Automatic Sprinkler Indus. Pens.*

*Fund,* 434 U.S. 586, 594, 98 S.Ct. 873, 55 L.Ed.2d 50 (1978). In this case, in accordance with the Miller Act, Atul purchased surety bonds from defendant Harleysville. (Compl., ¶ 5).

According to plaintiff, Atul has refused to pay $83,347.95 it owes plaintiff for contract work performed on the Fort Dix project. (Id. at ¶¶ 13–14). On or about August 28, 1998, plaintiff filed with Harleysville and Atul a written bond claim notice of monies due and owed on the project. (*Id.* at ¶ 5). On January 25, 1999, plaintiff filed the instant complaint seeking, *inter alia,* recovery of the $83,347.95 for subcontract work performed. To date, Harleysville has not paid plaintiff on the payment bond.

### II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### III.

In the instant motion, defendant Harleysville seeks to dismiss Count III of plaintiff's complaint. In Count III, plaintiff seeks damages from Harleysville for its alleged bad faith delay in responding to

plaintiff's claim on the payment bond. Plaintiff claims that Harleysville owes an independent duty to the beneficiaries of surety bonds and that Harleysville is liable for its tortious bad faith conduct in breaching that duty. Defendant argues that New Jersey law does not permit recovery for a claim of bad faith damages against a surety.[1]

The question of whether a subcontractor can sue a surety for bad faith conduct has yet to be considered by the New Jersey Supreme Court.[2] In fact, an extensive search by this Court has failed to produce any New Jersey cases dealing with this precise issue. In the absence of relevant state caselaw, our task is to predict how New Jersey's highest court would resolve this question. *Gares v. Willingboro Township*, 90 F.3d 720, 725 (3d Cir.1996).

In arguing that the New Jersey Supreme Court would not recognize such a cause of action, defendant Harleysville relies heavily on a case from the Eastern District of Tennessee. In *In re Technolo-*

*gy for Energy Corp.*, 123 B.R. 979 (Bkrtcy. E.D.Tenn.1991), the Tennessee Bankruptcy Court concluded that bad faith damages were not available in an action by a subcontractor against a surety under New Jersey law. In that case, the defendant Technology for Energy Corp. ("TEC") agreed to build a radiation monitoring system for a nuclear power plant that plaintiff, Bechtel Enginerring Co., was building in New Jersey. The surety, American Insurance Company ("American"), provided a combination payment and performance bond on behalf of TEC. Following TEC's declaration of bankruptcy, Bechtel brought suit against TEC and American to recover on the bond. American refused to pay any amount of money beyond the amount of the bond. Bechtel then sought damages for American's alleged bad faith refusal to make such payments.

The Tennessee Court cited the decision of the New Jersey Supreme Court in *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 N.J. 474, 323 A.2d 495 (1974). In that case, an injured resort guest brought

---

**1.** Although neither party has raised the issue, the Court notes that at least one federal district court has held that a subcontractor's supplemental state law claims against a contractor or surety may be preempted by the Miller Act. *See U.S. ex rel. Pensacola Constr. Co. v. St. Paul Fire and Marine Ins. Co.*, 710 F.Supp. 638 (W.D.La.1989). However, the holding in that case was subsequently superseded by the Prompt Payment Act, 39 U.S.C. § 3901 *et seq*. "The Prompt Payment Act, now expressly allows for subcontractors on federal projects to sue for the awarding of attorney's fees and penalties for late payment or nonpayment on the payment bond held by the surety provided that state law allows for such causes of action." *U.S. ex rel Cal's A/C & Elec. v. Famous Constr. Co.*, 34 F.Supp.2d 1042, 1044 (W.D.La.1999). It is now well established that the Miller Act does not preempt state law claims against sureties for conduct relating to their obligations under the Miller Act bond. *U.S. ex rel. Ehmcke Sheet Metal Works v. Wausau Ins. Co.*, 755 F.Supp. 906, 909 (E.D.Cal.1991); *see also U.S. ex rel. Aldridge Elec. Co. v. Pickus Constr. & Equip. Co.*, No. 98–C–3261, 2000 WL 190574, at *8 (N.D.Ill. Feb.9, 2000)("Plaintiffs who file Miller Act claims can also file pendant state contract claims.") (citing *Consolidated Elec. &*

*Mechanicals, Inc. v. Biggs Gen. Contracting, Inc.*, 167 F.3d 432, 436 (8th Cir.1999)).

**2.** A succinct description of the surety relationship has been provided by the New Jersey Superior Court, Appellate Division, in *In the Matter of the Liquidation of Integrity Ins. Co.*, 281 N.J.Super. 364, 657 A.2d 902 (App.Div. 1995), *aff'd*, 147 N.J. 128, 685 A.2d 1286 (1996). In that case, the superior court stated that:

> Suretyship is a contractual relation whereby one person or entity, the surety, agrees to be answerable for the debt or default of another, the principal. 74 Am. Jur.2d Suretyship § 1. The relationship created by the suretyship agreement is a "triparite one between the party insured, the principal obligor, and the surety." Id. at § 3. The surety's obligation is said to be accessory or collateral, not direct, to the principal's obligation, but the obligation to the creditor or obligee of the principal is said to be "direct, primary, and absolute." Id. at § 1. Stated another way, suretyship is a direct contract to pay the principal's debt if there is a default, but this liability is terminated immediately and completely if the principal pays or performs.
> *Id.* at 906–907.

suit against the Rova Farms Resort. The defendant insurance company provided liability insurance to the resort and also controlled the resort's defense in the underlying tort suit. The insurance company steadfastly refused to make a settlement offer for the full policy amount of $50,000.00. The injured guest ultimately obtained a judgment against the resort for $225,000.00.

The New Jersey Supreme Court allowed a claim for bad faith damages against the defendant insurer. The Court characterized a suit for bad faith damages as a suit sounding in both tort and contract and found that such a claim was appropriate here given the special relationship between the insured and the insurance company. *Id.* 323 A.2d at 511. In this case, the Court emphasized, the insurance company essentially acted as the resort's attorney in dealing with the injured guest. *Id.* at 504. The Court concluded that "an insurer, having contractually restricted the independent negotiating power of its insured, has a positive fiduciary duty to take the initiative and attempt to negotiate a settlement within the policy coverage." *Id.* at 496.

The Tennessee Court in *In re Technology for Energy* determined that the New Jersey Supreme Court's decision in *Rova Farms* to recognize a claim against an insurer for bad faith was driven by the "special relationship" between the insured and the insurer in that case. 123 B.R. at 986. The Court predicted that the New Jersey Supreme Court would not recognize a cause of action for bad faith damages in other contexts where such a special relationship was not present. For example, the Court noted that several New Jersey appellate courts had declined to recognize such a cause of action in cases where no third party was involved. The Tennessee Court reasoned:

> The decision in Rova Farms dealt with an insurance company's bad faith refusal to settle a third party's claim against the policyholder. Suppose no third party is involved; the insurance company refuses to pay the policy holder's own claim, known as a first party claim.

> Between the policy holder with a first party claim and the insurance company, no special relationship exists. There is only the insurance contract. Of course, every contract includes an implied duty of good faith and fair dealing. Does this mean that the policyholder has a tort claim or can recover punitive damages for breach of contract if the insurance company in bad faith refuses to pay his party claim?

> New Jersey's intermediate appellate court says "No." It has held that a policyholder cannot recover punitive damages from an insurance company for bad faith refusal to pay a first party claim. Bad faith by itself does not justify the recovery of tort damages; there must also be a special relationship created by the contract as in Rova Farms.

*Id.* at 986–87 (citations omitted).

The cases relied upon by the Tennessee Court in reaching this conclusion have either been explicitly or implicitly overruled by the decision of the New Jersey Supreme Court in *Pickett v. Lloyd's*, 131 N.J. 457, 621 A.2d 445 (1993). In that case, the New Jersey Supreme Court addressed the issue of whether an insured can recover bad faith damages against an insurer on a first party claim. Contrary to the prediction of the Tennessee court, the New Jersey Supreme Court concluded that such a cause of action did exist under New Jersey law.

In *Pickett* a truck-driver sued his insurer for its alleged bad faith failure to pay collision damage benefits when his tractor-trailer truck was destroyed in an accident. As in *Rova Farms*, the Supreme Court characterized this cause of action for bad faith refusal to pay as sounding in both tort and contract. *Id.* at 452. However, the Court emphasized that the label given to the cause of action was immaterial, "[c]ompensation should not be dependent

on what label we place on an action but rather on the nature of the injury inflicted on the plaintiff and the remedies requested." *Id.* at 452.

The Court concluded that an insured plaintiff could recover damages against an insurer for its bad faith delay in responding to a claim. The Court found that such a cause of action was necessary to deter insurance companies from delaying payment on legitimate insurance claims. In support of this argument, the Court cited the case of *Polito v. Continental Casualty Co.*, in which the Third Circuit held that "if liability is limited to the amount of the loss plus interest, [insurance companies] are encouraged to take advantage of the insured by delaying payments." 689 F.2d 457, 461 (3d Cir.1982). The Court also quoted the Superior Court Judge's rhetorical question to the defendant insurer:

> You mean that even if this had taken years that Lloyds [sic] hadn't paid[.] ... [I]f you weren't paid in January, February, March ... and you weren't paid in 1987, you weren't paid in 1988, you weren't paid in 1989; you mean that none of that would make any difference? That you folks don't have to pay until you get around to paying; and that the only remedy would be for loss of interest? That doesn't seem to be fair.

*Pickett,* 621 A.2d at 452–53.

■ This Court concludes that the New Jersey Supreme Court would apply the same rationale to a claim for bad faith damages brought by an obligee against a surety.[3] Although the relationship between an obligee and a surety is not identical to the relationship between an insurer and an insured, the relationships are closely analogous. *See In the Matter of the Liquidation of Integrity Ins. Co.,* 281 N.J.Super. 364, 657 A.2d 902, 909 (App.

Div.1995), *aff'd* 147 N.J. 128, 685 A.2d 1286 (1996)(holding that sureties in New Jersey are "considered to be in the business of insurers, and their obligation is to be liberally construed in accordance with the rules applicable to insurance policies") (citation omitted); *see also Transamerica Premier Ins. Co. v. Brighton Sch. Dist. 27J,* 940 P.2d 348, 352 (Colo.1997)("A special relationship exists between a commercial surety and an obligee that is nearly identical to that involving an insurer and an insured.").[4] Furthermore, the "nature of the injury inflicted" on the insured in *Pickett* and on the plaintiff here is nearly identical. *Pickett,* 621 A.2d at 452. Indeed, while not dispositive here, the Court notes that the majority of state supreme courts to have considered the issue have followed precisely the same reasoning used by the New Jersey Supreme Court in *Pickett* in recognizing a bad faith cause of action brought by an obligee against a surety. *See e.g., Transamerica,* 940 P.2d at 353 ("When the commercial surety withholds payment of an obligee's claim in bad faith, contract damages do not compensate the obligee for the commercial surety's misconduct and have no deterrent effect to prevent such misconduct in the future."); *Dodge v. Fidelity Deposit Co. of Maryland,* 161 Ariz. 344, 778 P.2d 1240, 1242–43 (1989) (holding that absent the availability of damages for bad faith conduct the surety will have an interest in retaining the money for as long as possible so that it may earn the higher rates of interest available on the outside market); *Suver v. Personal Service Ins. Co.,* 11 Ohio St.3d 6, 462 N.E.2d 415, 417 (1984)(holding that "to insulate the issuer of a [surety] bond from liability for the deliberate refusal to pay its obligations arising from the bond is to

---

3. In this case, plaintiff is the "obligee", Atul is the "principal" and Harleysville is the surety.

4. It is worth noting that New Jersey statutes have treated surety agreements as a type of insurance. *See* N.J.S.A. 17:22A–2 (" 'Insurance,' 'insurance policy' or 'insurance con-

tract' includes contracts or policies of life insurance, health insurance ... surety, guaranty and title insurance."); N.J.S.A. 17:29A–1 (" 'Policy of insurance,' without otherwise limiting its meaning, shall include guaranty and surety bonds.").

encourage the routine denial of payment of claims for as long as possible.").

Those courts which have refused to recognize a cause of action on behalf of an obligee for the bad faith conduct of a surety have noted that imposing a duty to act in good faith towards the obligee could conceivably run counter to the surety's preexisting duty to the principal. For example, in *U.S. ex rel Ehmcke Sheet Metal Works v. Wausau Ins. Companies,* the district court for the Northern District of California concluded that permitting a subcontractor to sue a surety for bad faith would create "an unresolvable conflict of interest for the surety." 755 F.Supp. 906, 911 (N.D.Cal.1991). In that case, the Court refused to allow the obligee to sue the surety for bad faith conduct because "[t]he surety owes the party who obtained the bond a duty of good faith and fair dealing ... If the surety may also be liable to a third party for bad faith, then it may be forced to compromise the duty to one to fulfill the duty to the other." *Id.*

The Court finds this reasoning unpersuasive. The duty to exercise good faith in responding to the claim of an obligee is not a particularly onerous one. A surety will be found to have breached this duty only if "no valid reasons existed to delay processing the claim and the [surety] knew or recklessly disregarded the fact that no valid reasons supported the delay." *Pickett,* 621 A.2d at 457–58. Liability for bad faith delay will not be imposed in cases of "simple negligence." *Id.* at 457. Thus, the surety will be free to investigate the validity of the obligee's claims and any potential defenses to those claims without running afoul of its duty to act with good faith towards the obligee. "Although the commercial surety's obligations may be more complex than those of an insurer, this complexity does not authorize a commercial surety to disregard its obligation to act in good faith." *Bd. of Directors of Ass'n of Apartment Owners v. United Pac. Ins. Co.,* 77 Hawai'i 358, 884 P.2d 1134, 1137–38 (1994).

The paramount purpose of a surety agreement is to protect the obligee in the event of the principal's default. *See In the Matter of Integrity,* 657 A.2d at 910 (holding that the purpose of a surety agreement is to ensure that the principal fulfills the contract so that the obligee does not have to). This purpose would be contravened if a surety could refuse to respond to a legitimate claim in a timely fashion and incur liability solely for the amount of the bond plus interest. *See Dodge,* 778 P.2d at 1241 ("Permitting a surety to withhold performance of its obligations without reason would defeat the purpose for which surety insurance is intended."). Thus, this Court concludes that the New Jersey Supreme Court would, for the reasons set forth in *Pickett v. Lloyd's,* recognize a claim for bad faith delay by an obligee against a surety.

## IV.

Defendant Harleysville argues that even if a cause of action for bad faith delay exists against a surety under New Jersey law, summary judgment is appropriate because plaintiff has not shown that defendant acted in bad faith. Defendant claims that it did not make payment on plaintiff's claims because representatives of plaintiff indicated to defendant that plaintiff and Atul were in the process of negotiating a settlement of the claim. Defendant states that it took no action on the claim "because it reasonably believed the matter would be resolved." (Def.'s Mem. Supp. Summ. J. at 5). In addition, defendant claims that in November of 1998 it learned that a settlement was not likely and it has actively investigated plaintiff's claims and Atul's possible defenses since that time. (*Id.* at 2). According to defendant, this process has been delayed because it has had trouble obtaining information from Atul because "Atul has been represented by three different attorneys in the past ten months." (Def.'s Resp. at 5–6).

Plaintiff states that "from August 1998 (when Siegel filed its claim) to January

1999 (when Siegel's complaint was filed) Harleysville[ ] deliberately took no action with regard to Siegel's claim." (Pl.'s opp. at 10). During this time period, plaintiff contends that it received one perfunctory telephone call from defendant which acknowledged receipt of plaintiff's claim and that, despite plaintiff's requests, no further information was provided by defendant. (*Id.*) Furthermore, plaintiff claims that, contrary to defendant's assertions, it never advised defendant that it should delay investigating its claims while plaintiff and Atul attempted to negotiate a settlement. (*Id.*)

In accordance with the New Jersey Supreme Court's holding in *Pickett*, defendant Harleysville cannot be found liable for alleged bad faith conduct unless "no valid reasons existed to delay processing the claim and [defendant] knew or recklessly disregarded the fact that no valid reasons supported the delay." 621 A.2d at 457–58. Although the Court acknowledges that this is a high standard, the Court is unable to say that no genuine issues of material fact exist with respect to this claim so that judgment for defendant should be entered as a matter of law. Accepting the facts in light most favorable to plaintiff, the non-moving party, it is possible that a reasonable jury could conclude that defendant Harleysville acted with bad faith. Accordingly, an entry of summary judgment is not appropriate at this time.

## V.

For the reasons set forth above, defendant's motion for partial summary judgment is denied. The Court will enter an appropriate order.