556 S.E.2d 371

**MASTERCLEAN, INC., CPM Environmental, Inc., William B. Smith and Barbara P. Smith, Plaintiffs,**

v.

**STAR INSURANCE CO., Defendant and Third Party Plaintiff,**

v.

**Masterclean of North Carolina, Inc., Third Party Defendant.**

No. 25379.

Supreme Court of South Carolina.

Heard Oct. 23, 2001.

Decided Nov. 26, 2001.

Robert Bryan Barnes and Kate B. Barroll, of Rogers, Townsend & Thomas, of Columbia, for Plaintiffs.

C. Allen Gibson, Jr., and Jonathan D. Crumly, Sr., both of Buist, Moore, Smythe & McGee, of Charleston, for Defendant/Third Party Plaintiff.

L. Franklin Elmore and Nancy W. Monts, of Ogletree, Deakins, Nash, Smoak & Stewart, of Greenville; and Edward G. Gallagher, of Washington, DC, for Amicus Curiae The Surety Association of America.

Justice BURNETT.

We agreed to answer the following questions certified by the United States District Court for the District of South Carolina:

Does South Carolina recognize a cause of action in tort by a principal against its surety for the surety's bad faith refusal to pay first party benefits to an obligee pursuant to a construction performance bond?

If so, what are the elements of this cause of action and what legal standards apply to the surety's actions in the investigation and resolution of an obligee's claim against the bond?

Does a principal have a private right of action against its surety pursuant to S.C.Code. Ann. §§ 38–57–70 & 38–59–20 (1989)?

## FACTS

The University of South Carolina ("U.S.C.") contracted with Masterclean, Inc.[1] ("Masterclean") to remove asbestos from a

---

1. Plaintiffs Masterclean, Inc., CPM Environmental, Inc., William B. Smith and Barbara P. Smith sued Star Insurance Company in state court. Star removed the case to federal court. Star filed a Third Party Complaint against Masterclean for indemnification. For simplicity we refer to Masterclean, Inc., CPM Environmental, Inc., William B. Smith and Barbara P. Smith collectively as Plaintiff.

U.S.C. building. Masterclean obtained a performance bond from Star Insurance Company ("Star") pursuant to South Carolina law for $1,383,214 to assure performance. *See* S.C.Code Ann. § 11–35–3030(2)(i) (Supp.2000).

U.S.C. notified Star in November 1995 of Masterclean's default on the contract and made a claim on the bond. Star began a claim investigation. U.S.C. formally terminated the contract in December 1995.

Star eventually concluded Masterclean defaulted on the contract but refrained from deciding the claim on the bond pending negotiations with U.S.C. As negotiations progressed, U.S.C. hired a replacement contractor to complete the project.

The South Carolina Chief Procurement Officer issued a ruling in May 1996 finding Masterclean in default and ordering it to pay $1,000,000 in damages. All parties entered a negotiated settlement for $900,000 with Star liable for $100,000 and Masterclean paying the difference.

Plaintiff argues Star should have mitigated the damages by performing its bond obligations once it determined Masterclean defaulted and before U.S.C. obtained a replacement contractor.[2] Plaintiff alleges Star's failure to take over the project entitles it to damages in tort for Star's bad faith refusal to honor U.S.C.'s claim under the bond.

## ISSUE

Can Plaintiff sue Star in tort for its bad faith refusal to pay U.S.C. under the performance bond?

## LAW/ANALYSIS

A surety is a tripartite agreement among the surety company, the principal who is primarily responsible for per-

---

**2.** The bond provided, in part:

Whenever the Contractor shall be, and declared by Owner to be in default under the Contract, the Owner having performed Owner's obligations thereunder, the Surety may promptly remedy the default, or shall promptly

1) Complete the contract in accordance with its terms and conditions, or

2) Obtain a bid or bids for completing the Contract in accordance with its terms and conditions, and ... arrange for a contract between such bidder and Owner.

forming the contract, and the obligee for whose benefit the agreement is made. 74 Am.Jur.2d *Suretyship* § 3 (1974). "Suretyship is a contractual relation resulting from an agreement whereby one person, the surety, engages to be answerable for the debt, default, or miscarriage of another, the principal." *Id.* § 1; *see also, Philco Fin. Corp. v. Mehlman,* 245 S.C. 139, 139 S.E.2d 475 (1964). South Carolina law treats a surety agreement as a credit arrangement where the surety lends credit to the principal who otherwise has insufficient credit to obtain the contract with the obligee. *Philco Fin. Corp. v. Mehlman, supra.*

A surety must pay the obligee only if the principal defaults, but the surety generally retains a right of indemnification from the principal. Restatement (Second) of Security § 82 cmt. b (1974). At all times, the principal retains the primary obligation to perform the contract and the primary liability for default of the contract. 74 Am.Jur.2d *Suretyship* § 3 (1974).

Plaintiff asserts sureties are insurers and a performance bond is insurance. Such a determination would allow Plaintiff to sue in tort for Star's bad faith refusal to pay insurance benefits on a first party claim under *Nichols v. State Farm Mutual Automobile Ins. Co.,* 279 S.C. 336, 306 S.E.2d 616 (1983). This is an issue of first impression in South Carolina.[3] A survey of other states shows a split of authority in allowing such suits. *See Transamerica Premier Ins. Co. v. Brighton Sch. Dist. 27J,* 940 P.2d 348 (Colo.1997)(finding an obligee may sue a surety in tort for bad faith refusal); *see also, United States for the Use of Don Siegel Constr. Co., Inc. v. Atul Constr. Co.,* 85 F.Supp.2d 414 (2000)(Federal district court construing New Jersey law to allow an obligee to sue for bad faith damages against a surety); *Loyal Order of Moose, Lodge 1392 v. International Fid. Ins. Co.,* 797 P.2d 622 (Alaska 1990); *Dodge v. Fidelity and Deposit Co.,* 161 Ariz. 344, 778 P.2d 1240 (Ariz.1989); *K–W Indus. v. National Sur. Corp.,* 231 Mont. 461, 754 P.2d 502

---

**3.** While the South Carolina Court of Appeals dealt with this issue in *American Fire and Casualty Co. v. Johnson,* 332 S.C. 307, 504 S.E.2d 356 (Ct.App.1998), it refused to determine whether *Nichols* applied to sureties.

(Mont.1988); *Szarkowski v. Reliance Ins. Co.*, 404 N.W.2d 502 (N.D.1987); *cf. Board of Dirs. of Ass'n of Apartment Owners v. United Pac. Ins. Co.*, 77 Hawai'i 358, 884 P.2d 1134 (Haw. 1994)(court found a surety owes a duty of good faith to the obligee and principal on the bond, but specifically declined to address whether Hawaii recognized a tort claim against a surety for bad faith refusal); *but see, Cates Constr., Inc. v. Talbot Partners*, 21 Cal.4th 28, 86 Cal.Rptr.2d 855, 980 P.2d 407 (Cal.1999)(California does not recognize an obligee's bad faith tort claim against a surety); *Great American Ins. Co., v. North Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415 (Tex. 1995); *Institute of Mission Helpers of Baltimore City v. Reliance Ins. Co.*, 812 F.Supp. 72 (D.Md.1992)(construing Maryland law to not allow a bad faith claim by obligee against surety).

Plaintiff advances three arguments to support the contention that a surety agreement is an insurance contract subjecting the surety to a *Nichols* claim. Initially, Plaintiff asserts the Legislature intended to treat sureties as insurance companies for purposes of *Nichols* liability because they are regulated by the state insurance code. *See* S.C.Code Ann. § 38–1–10, *et. seq.* (Supp.2000). Several courts who find an action for a surety's bad faith refusal to pay an obligee base their decision on similar state laws. *See Transamerica Premier Ins. Co. v. Brighton Sch. Dist. 27J, supra; Dodge v. Fidelity and Deposit Co., supra.*

The South Carolina Insurance Code regulates surety companies. *See* S.C.Code Ann. § 38–1–20(13), (22), (25), (37) (Supp.2000). However, the surety's presence in a regulatory scheme does not render common law duties of an insurer applicable to a surety. A bad faith tort action arises from the common law due to special characteristics of the insurance relationship, not simply because it is a regulated industry. *See Nichols v. State Farm Mut. Auto. Ins. Co., supra.* The insurance regulatory scheme provides for administrative penalties, not a *Nichols* common law right of action. *See* S.C.Code Ann. § 38–2–10 (Supp.2000) (providing administrative penalties for violating the insurance laws of this state). In sum, because South Carolina regulates surety companies under the insurance code does not mandate finding a *Nichols* common law action in this case. *Cf. Wilson v. McLeod,* 274

S.C. 525, 265 S.E.2d 677 (1980) (the presence of a business in the insurance code does not necessarily create an insurance relationship).

Next, Plaintiff contends this Court should extend *Nichols* to sureties because courts treat surety agreements as insurance contracts at common law. Plaintiff misconstrues the common law's analogy between surety contracts and insurance contracts. A leading treatise on insurance practice highlights the source of this confusion:

It has frequently been held that contracts of suretyships are regarded as those of "insurance," where a corporate surety engages in the business for a profit, and that the rights and liabilities of the parties are governed by the rules applicable to contracts of insurance. This is a rule governing the construction of such contracts, however, and is not intended to alter the normal incidents of a suretyship contract, such as the surety's recourse against the principal for losses paid by it. If a compensated surety's contracts were regarded as insurance for all purposes, it is apparent that the surety would not have such right of recourse, together with all the other rights and duties which devolve upon a surety as such.

Appleman, *Insurance Law and Practice*, § 5273 (1981).

The treatise clearly shows the surety-insurance analogy is intended for purposes of contract construction alone. This analysis is supported by our holding in *State Agricultural & Mechanical Society v. Taylor*, 104 S.C. 167, 88 S.E. 372 (1916). In that case, we examined the difference between a "voluntary" surety and a for-profit surety company. Traditionally, courts viewed sureties as a favorite of the law, construing contracts *strictissimi juris* resolving all doubts and technicalities in the surety's favor. *See* Laurence P. Simpson *Suretyship* 101–12 (1950).

The *State Agricultural & Mechanical Society* rule removes *strictissimi juris* in surety contracts by for-profit companies. Courts now construe for-profit surety contracts similar to insurance contracts, resolving any doubts against the surety. *See, Greenville Airport Commission v. U.S. Fidelity & Guaranty Co. of Baltimore, Md.*, 226 S.C. 553, 86 S.E.2d 249 (1955). Courts analogize insurance with surety for purposes of contract construction, not to expand common law duties in tort.

Finally, Plaintiff attempts to create a common law duty by arguing the public policy reasons articulated in *Nichols* exist in the surety context. These policy considerations are either nonexistent or less persuasive in the surety context.

One public policy rationale the *Nichols* Court relied upon was the existence of a strong public interest in insurance contracts. *Nichols,* 279 S.C. at 340, 306 S.E.2d at 619. A surety agreement affects the public interest, but its interest is significantly less than in insurance. Surety agreements in public construction projects involve commercial entities and do not involve the public's interest as do insurance contracts. *See e.g.,* S.C.Code Ann. § 56–10–20 (Supp.2000)(requiring all motor vehicle owners in South Carolina to maintain liability insurance).

A second public policy reason the *Nichols* court relied upon was an insured lacks bargaining power and must accept policies on an accept or reject basis. *Nichols,* 279 S.C. at 340, 306 S.E.2d at 619. Inequities in bargaining power are largely absent in the surety context because the obligee, not the surety, usually dictates the bond requirements.

A more important distinction is the obligations of each party are set by the underlying construction contract, not the bond. On a public project, the owner sets the terms of the contract and all bidders must agree to it, the surety usually does not participate in these negotiations and has little or no say in the terms of the contract whose performance it guarantees. *See* R. Cooper Shattuck, *Bad Faith: Does It Apply To Sureties In Alabama?,* 57 Ala. Law. 241, 244 (1996). The principal is in position to contractually control the limits of its performance and liability. This process contrasts sharply with insurance where the insurer offers policies on standard forms on an accept or reject basis.

Another public policy reason underlying *Nichols* holding is the understanding an insurer, liable only in contract, may delay and deny a claim with virtual impunity at the risk of only paying the policy limits. *Nichols,* 279 S.C. at 340, 306 S.E.2d at 619. We have previously held a surety's liability cannot extend beyond the penal amount of the bond. *South Carolina Pub. Serv. Comm'n v. Colonial Constr. Co.,* 274 S.C. 581, 266 S.E.2d 76 (1980). This situation may give the surety,

like an insurer, the incentive to delay and deny bond claims because it will ultimately only have to pay the bond amount.

We believe this factor alone is insufficient to recognize a bad faith claim for sureties. This determination is strengthened by this Court's reluctance to extend tort actions for violating good faith obligations. *See* F.P. Hubbard & R.L. Felix, *The South Carolina Law of Torts* 54–55 (1990). The presence of a principal's use of bad faith as a defense in contract, discussed below, also mitigates any danger of a surety company acting in bad faith to delay payment under the bond.

The *Nichols* court completed its public policy analysis by noting an "insured does not contract to obtain any kind of commercial advantage or leverage but only to protect himself against the specter of accidental [or unavoidable] loss." *Nichols,* 279 S.C. at 340, 306 S.E.2d at 619 (quoting *Trimper v. Nationwide Ins. Co.,* 540 F.Supp. 1188, 1193 (D.S.C.1982)). A surety bond, unlike insurance, is used to obtain a commercial advantage. "The principal does not seek protection from the surety against calamity . . . the principal seeks the commercial advantage of obtaining a contract with the obligee, which requires a performance or payment bond." Bernard L. Balkin & Keith Witten, *Current Developments in Bad Faith Litigation Involving the Performance and Payment Bond Surety,* 28 Tort & Ins. L.J. 611, 624 (1993).

The state requires performance bonds for public construction contracts to protect itself from a principal's breach. The principal obtains the bond merely for the economic advantage of competing for the contract. There is no objective economic reason why a principal would voluntarily choose to provide a bond since it still bears the burden of performing and indemnifying the surety for any default. *See* Simpson, *supra,* at 2–3.

Even if the public policy concerns outlined in *Nichols* were present here, the nature of the principal-surety relationship itself would mandate finding a bad faith cause of action by a principal against its surety does not sound in tort. We note Plaintiff does not cite to any case which a court allowed a principal to sue its surety in tort for a bad faith refusal to pay a claim. In fact, our research indicates no court has held a surety liable to the principal "on the basis of the special

relationship that has been found in insurance cases." Balkin & Witten, *supra,* at 623–24; *see e.g., Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276 (Tex.1998).

The reason for this absence of support in the case law is the general understanding that a principal cannot maintain a suit against a surety for his own default. 74 Am.Jur.2d *Suretyship* § 205 (1974). The surety bond makes the surety and principal responsible to the obligee. *Tooks v. Indemnity Insurance Co.,* 381 Pa. 607, 610, 114 A.2d 135, 136 (Pa.1955). The bond is designed to protect the obligee not the principal.

The bond's primary obligation rests on the principal to perform the contract. When the principal fails, the surety performs according to the terms of the bond. The surety is then entitled to indemnity from the principal. Once the principal defaults, its interests are tertiary to the obligee and the surety.

Regardless of *Nichols'* public policy applicability, the bond does not exist to protect the principal against an unknown calamity but to protect the obligee against the principal's potential default. It cannot be said a principal is the true intended beneficiary of the bond.

In holding that a principal cannot sue a surety in tort for a bad faith refusal to pay a first party claim, it is important to note we do not preclude a principal from using a surety's bad faith in all instances. Several courts, including those not recognizing a principal's right to sue on bad faith in tort, allow the principal to assert a surety's bad faith as a defense to indemnification. Balkin & Witten, *supra,* at 623; *see, e.g., Associated Indem. Corp. v. CAT Contracting, Inc., supra.* Our Court of Appeals dealt with this issue in dicta in *American Fire and Casualty Co. v. Johnson, supra.* While a principal may not use bad faith as a sword to extract damages from a surety in tort, a principal is not precluded from using bad faith as a shield in contract against a surety seeking indemnification.[4]

---

4. Although we conclude a principal cannot assert a *Nichols* action against its surety, we do not decide whether an obligee may institute such an action against its surety.

Having answered the first question in the negative, the second question is moot.

## ISSUE

Do S.C.Code. Ann. §§ 38–57–70 & 38–59–20 (1989) provide a private right of action?

## LAW/ANALYSIS

 Plaintiff asserts the Insurance Trade Practices Act, S.C.Code Ann. §§ 38–57–10, *et seq.* (1989), and the Claims Practices Act, S.C.Code Ann. §§ 38–59–20, *et seq.* (1989), create private causes of action. We disagree.

The Insurance Trade Practices Act prohibits insurers from misrepresenting an insurance policy with the intent to settle the claim "on less favorable terms than those provided in and contemplated by the contract or policy." S.C.Code Ann. § 38–57–70 (1989). The statute mandates the penalties for violating the statute. S.C.Code Ann. § 38–2–10 (1989). The Department of Insurance is vested with determining whether an insurer has violated the insurance code. *See* S.C.Code Ann. § 38–3–110. The statute clearly manifests legislative intent to create an administrative remedy and not a private right of action.

The Claims Practice Act provides relief for a third party victim of an improper claims practice. S.C.Code Ann. §§ 38–59–10, *et seq.* (Supp.2000). This relief is important because South Carolina does not recognize a third party action for bad faith refusal to pay insurance benefits. *Kleckley v. Northwestern Nat'l Cas. Co.,* 330 S.C. 277, 498 S.E.2d 669 (1998).

Third parties do not have a private right of action under S.C.Code Ann. § 38–59–20. *Gaskins v. Southern Farm Bureau Cas. Ins. Co.,* 343 S.C. 666, 541 S.E.2d 269 (Ct.App.2000). Instead, third parties are entitled to administrative review before the Chief Insurance Commissioner. *See Kleckley v. Northwestern National Casualty Company, supra;* S.C.Code Ann. § 38–59–30 (Supp.1999).

**Certified Questions Answered**

TOAL, C.J., MOORE, WALLER and PLEICONES, JJ., concur.